ACCEPTED
13-15-00180-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
11/23/2015 4:02:00 PM
Dorian E. Ramirez
CLERK

NO. 13-15-00180-CV

IN THE THIRTEENTH COURT OF APPEALS

CORPUS CHRISTI/EDINBURG TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
12/3/2015 4:02:14 PM
DORIAN E. RAMIREZ
Clerk

No. 13-10-22,801

24th District Court

DeWitt County, Texas

Honorable Kemper Stephen Williams

---

AIR JIREH SERVICE CORPORATION, HVAC PLUMBING SPECIALIST CORPORATION A/K/A HVAC PLUMBING SPECIALIST CORPORATION A/K/A HVAC PLUMBING SPECIALIST INC., D/B/A AIR JIREH SERVICE A/K/A AIR JIREH SERVICES AND OSKAR SEPULVEDA, JR.

Appellants

V.

WEAVER & JACOBS CONSTRUCTORS, INC.

Appellee

---

**APPELLANT'S FIRST AMENDED BRIEF**

---

Rene Zarazua
State Bar No. 24077285
Attorney for Appellants
Law Office of Lee Hernandez
A Professional Corporation
4100 NW Loop 410, Suite 100
San Antonio, Texas 78229
Tel.: 210.735.4202
Fax: 210.735.4231
rene@leehernandez.com

# IDENTITY OF PARTIES AND COUNSEL

*Appellants*

> Air Jireh Service Corporation
>
> HVAC Plumbing Specialist Corporation a/k/a HVAC Plumbing Specialist Corporation a/k/a HVAC Plumbing Specialist Inc. d/b/a Air Jireh Service a/k/a Air Jireh Services
>
> Oskar Sepulveda, Jr.

*Counsel for Appellants*

> Rene Zarazua
> State Bar No. 24077285
> Law Office of Lee Hernandez
> A professional Corporation
> 4100 NW Loop 410, Suite 100
> San Antonio, Texas 78229

*Appellee*

> Weaver & Jacobs Constructors, Inc.

*Counsel for Appellee*

> Clayton C. Utkov
> State Bar No. 24028180
> Christopher A. Scifres
> State Bar No. 24088374
> FORD NASSEN & BALDWIN P.C.
> 111 Congress, Suite 1010
> Austin, Texas 78701

*Presiding Judge*

> The Honorable Kemper Stephen Williams

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL...........................................................................i

TABLE OF CONTENTS...............................................................................................ii

INDEX OF AUTHORITIES..........................................................................................iii

STATEMENT OF THE CASE.........................................................................................1

ISSUES PRESENTED....................................................................................................2

STATEMENT OF THE FACTS........................................................................................3

SUMMARY OF THE ARGUMENT.................................................................................4

ARGUMENT.................................................................................................................6

PRAYER......................................................................................................................17

CERTIFICATE OF COMPLIANCE................................................................................18

CERTIFICATE OF SERVICE.........................................................................................18

APPENDIX...................................................................................................................19

# INDEX OF AUTHORITIES

## Cases

*Airborne Freight Corp. v. C.R. Lee Enters.*
847 S.W.2d 289 (Tex.App.-El Paso 1993, writ denied)..................................................15


*Antonini v. Harris County Appraisal Dist.*
999 S.W.2d 608, 614 (Tex. App.-Houston [14th Dist.] 1999, no pet.). .......................8


*Ashford Dev., Inc. v. USLife Real Estate Serv. Corp.*
661 S.W.2d 933, 935 (Tex.1983))...........................................................................11-12


*Bavarian Autohaus, Inc. v. Holland*
570 S.W.2d 110, 116 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ)...................16


*Baylor Univ. v. Sonnichsen*
221 S.W.3d 632, 635 (Tex. 2007) ................................................................................8


*Copeland v. Alsobrook,*
3 S.W.2d 598, 604 (Tex. App.-San Antonio 1999, pet. denied).....................................9


*Corpus Christi Dev. Corp. v. Carlton*
644 S.W.2d 521, 523 (Tex.App.—Corpus Christi 1982, no writ)..................................16


*Daldav Associates, L.P. v. Lebor*
391 F. Supp. 2d 472, 476 (N.D. Tex. 2005)...............................................................*15*


*Dallas Firefighters Ass'n v. Booth Research Group, Inc.,*
156 S.W.3d 188, 194 (Tex.App.-Dallas 2005).............................................................15


*DeSantis v. Wackenhut Corp.,*
793 S.W.2d 670, 688 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755,
112 L.Ed.2d 775 (1991)..........................................................................................12,14


*Dolenz v. Continental National Bank*
620 S.W.2d 572, 576 (Tex. 1985)..................................................................................6

*English v. Fischer*
660 S.W.2d 521, 524 (Tex. 1993)..................................................................................10

*Federal Sign v. Texas S. Univ.*
951 S.W.2d 401, 408-09 (Tex. 1997))...........................................................................8

*Flint & Assoc. v. Intercontinental Pipe & Steel, Inc.*
739 S.W.2d 622, 624 (Tex.App.—Dallas 1987, writ denied)........................................16

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,*
960 S.W.2d 41, 47-48 (Tex. 1998)...........................................................................12,14

*Graves v. Sommerfeld*
618 S.W.2d 952, 954–55 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.)......................16

*Green Tree Acceptance, Inc. v. Pierce*
768 S.W.2d 416, 425 (Tex.App.—Tyler 1989, no writ)................................................16

*Gulf Coast Farmers Co-op v. Valley Co-op Oil Mill,*
572 S.W.2d 726, 737 (Tex. Civ. App.-Corpus Christi 1978)..........................................8

*Harco Energy, Inc. v. Re-Entry People, Inc.*
23 S.W.3d 389, 392 (Tex. App.-Amarillo, no pet.).........................................................8

*Hernandez v. Ikon Office Solutions, Inc.*
306 F. App'x 180,182 (5th Cir. 2009)...........................................................................11

*Kimbrough v. Fox*
631 S.W.2d 606, 609 (Tex.App.—Fort Worth 1982, no writ)........................................15

*Lane & Nearn v. Warren*
115 S.W. 903 (Tex. Civ. App. 1909, writ refused).........................................................8

*Morrow v. H.E.B., Inc.*
714 S.W.2d 297, 298 (Tex.1986)....................................................................................6

*Oxoco Exploration & Prod., Inc. v. Arrowhead Drilling Corp.*
No. A14 86 181 CV, 1986 WL 13431, at *1 (Tex. App. Nov. 20, 1986)................................6

*Premium Hospitality, L.L.C. v. Astra Capital Funding,*
CIV.A. 12-0779, 2014 WL 896807 (E.D. La. Mar. 6, 2014)........................................10

*Rosas v. Bursey*
724 S.W.2d 402, 410–11 (Tex.App.—Fort Worth 1986, no writ)..............................16

*Schindler v. Austwell Farmers Coop.*
841 S.W.2d 853, 854 (Tex.1992)......................................................14,16

*Spoljaric v. Percival Tours, Inc.*
708 S.W.2d 432 (Tex. 1986)..........................................................14

*Sears, Roebuck & Co. v. Meadows*
877 S.W.2d 281, 282 (Tex. 1994)....................................................12,14

*Stanfield v. O'Boyle*
462 S.W.2d 270, 272 (Tex. 1971).....................................................14

*Stewart Title Guar. Co. v. Sterling*
822 S.W.2d 1, 11 (Tex. 1991).........................................................16

*Stone v. Lawyers Title Ins. Corp.*
554 S.W.2d 183, 185 (Tex.1977).....................................................12,14

*Tony Gullo Motors I, L.P. v. Chapa*
212 S.W.3d 299, 304 (Tex.2006).......................................................11

*T.O. Stanley Boot Co. v. Bank of El Paso*
847 S.W.2d 218, 222 (Tex. 1992)......................................................14

*United Concrete Pipe Corp. v. Spin-Line Co.*
430 S.W.2d 360, 364 (Tex. 1968).......................................................8

*Villasenor v. Villasenor*
911 S.W.2d 411, 420 (Tex. App. 1995)..............................................................16

*Weynand v. Weynand*
990 S.W.2d 843, 846 (Tex. App.-Dallas 199, pet. denied.).................................8

## Statutes

Tex. Bus. & Com. Code § 17.46(a).....................................................................12
Tex. Bus. & Com. Code Ann. § 17.49.................................................................12
Tex. Bus. & Com. Code Ann. § 26.01...................................................................9

**TO THE HONORABLE THIRTEENTH COURT OF APPEALS:**

Appellants, Air Jireh Services Corporation (herein "AJS Corp."), HVAC Plumbing Specialist Corporation A/K/A HVAC Plumbing Specialist Inc. D/B/A Air Jireh Service A/K/A/ Air Jireh Services (herein "Air Jireh") and Oskar Sepulveda, Jr. (herein "Sepulveda") file this brief asking the Court to reverse the Order of the trial court against AJS Corp., Air Jireh, and Sepulveda (herein collectively "Appellants"). Appellants respectfully show that prior to the filing of this brief, Appellant Sepulveda, filed a Notice of Bankruptcy in this Court. As such, in order to not violate the Stay as to Sepulveda, Appellants continue the references to Sepulveda in this brief only for purposes of continuity in Appellant AJS Corp. And Air Jireh's argument and not to assert any relief in violation of the Bankruptcy Stay.

## STATEMENT OF THE CASE

This is an appeal from the February 2, 2015 trial concerning Plaintiff, Weaver and & Jacobs (herein "Weaver & Jacobs") claims of Breach of Contract, Promissory Estoppel, and Violation of the Texas Deceptive Trade Practices Act against AJS Corp. and claims of Fraud and Negligent Misrepresentation against Sepulveda.

Weaver & Jacobs filed an original petition against AJS Corp. for Breach of Contract and Promissory Estoppel on or about October 3, 2013. AJS Corp. filed an Original Answer on October December 2, 2013. Weaver and Jacobs then filed a Second Amended Petition on January 22, 2014 alleging a third cause of action of Violation of the Deceptive Trade Practices Act. Weaver and Jacobs filed their Traditional Motion for Summary Judgment on May 8, 2014. AJS Corp. filed its Response to Weaver & Jacob's Traditional Motion for Summary Judgment on June 24, 2014. A hearing was held on Weaver & Jacob's Motion for Summary Judgment on July 2, 2014 and it was denied by Order dated November 26, 2014. On July 30, 2014, AJS Corp. filed its Supplemental Answer and Counterclaim. On August 4, 2014, Weaver & Jacobs filed its

Third Amended Petition adding additional Defendant Air Jireh, and alleging additional causes of action of Fraud and Negligent Misrepresentation against additional Defendant Sepulveda. Air Jireh and Sepulveda filed an Answer on September 1, 2014. A trial on the merits was held on February 2, 2014. The Court rendered its Judgment on February 5, 2015 against Appellants. Appellants filed their Objections to Proposed Judgment and Motion to Clarify Court's Ruling setting the matter for hearing on March 23, 2015. Appellants filed their Request for Findings of Fact and Conclusions of Law on February 25, 2015. The Court signed a Judgment on March 5, 2015. The Court rendered its Findings of Fact and Conclusions of Law on March 20, 2015. Appellants filed their Notice of Appeal on April 23, 2015.

## ISSUES PRESENTED

1. Whether the Trial Court erred in its Findings of Fact and Conclusions of law in granting a judgment against AJS, Corp.

2. Whether the Trial Court erred in ruling that a valid, enforceable contract was formed between Weaver & Jacobs and Appellants.

3. Whether the Trial Court erred in ruling that Air Jireh's Bid represented Air Jireh's enforceable promise, in such a manner that Weaver & Jacobs would act in reliance on the promise; and that Weaver & Jacobs did rely on the promise to its detriment.

4. Whether the Trial Court erred in ruling that Weaver & Jacobs is entitled to any protections afforded to consumers under the DTPA.

5. Whether the Trial Court erred in ruling that Sepulveda submitted a copy of Air Jireh's resume which contained several representations; that these representations were false; that Sepulveda made these representations with knowledge of their falsity or recklessly, as positive assertions, without knowledge of their truth; and that Weaver & Jacobs relied on Oskar Sepulveda's false representations.

-2-

6. Whether the Trial Court erred in ruling that Sepulveda submitted the Bid to Weaver & Jacobs, in which he represented that Air Jireh would perform the Work in exchange for the sum of $125,971.00; that these representations were false; that Sepulveda made these representations with knowledge of their falsity or recklessly, as positive assertions, without knowledge of their truth; and that Weaver & Jacobs relied on Sepulveda's false representations.

7. Whether the Trial Court erred in ruling that Sepulveda represented to Weaver & Jacobs that Air Jireh had 20 years experience , that Air Jireh had performed certain jobs, and that Air Jireh would perform the Work in exchange for $125,971.00; that these representations were false; that Sepulveda intended that Weaver & Jacobs to rely on said.

8. Whether the Trial Court erred in awarding attorney fees to Weaver & Jacobs.

## STATEMENT OF FACTS

The parties filed a Joint Statement of Stipulated Facts.  Additionally, on June 26, 2013, Sepulveda, Project Manager for Air Jireh found a request for proposals on the Builders Exchange Website regarding the Taft Independent School District High School Improvements projects (herein the "Project").  The same day Sepulveda submitted an email bid (herein "original bid") to Weaver & Jacobs in the amount of $147,732.00.  The original bid was per the plans and specifics of the project and was to include certain digital controls (herein "controls").  Due to the fact Weaver & Jacobs were over budget, Mike Weaver of Weaver & Jacobs contacted Sepulveda to engage in value engineering.  On July 7, 2013, Mr. Weaver sent Air Jireh an email informing Air Jireh that Weaver & Jacobs wanted to replace the controls with wall-mounted thermostats.  On July 9, 2014 Air Jireh responded to Weaver & Jacobs by submitting a revised bid (herein "first revised bid") in the amount to f $132, 670.00 and was incorrectly dated June 26, 2013.  According to Weaver & Jacobs, Air Jireh had not adjusted the first revised bid to recognize the full reduction price due to the fact that the controls were a single-source

specification. Air Jireh submitted another revised bid (herein "second revised bid") in the amount of $125,971.00 which indicated thermostats instead of controls and was also incorrectly dated June 26, 2013. On July 23, 2013 Weaver & Jacobs sent a subcontract for Air Jireh to review and sign. Air Jireh reviewed the subcontract and noticed problems with the subcontract. The first problem with the contract was the commencement date. The date on the contract was June 25, 2013. The commencement date was also June 25, 2013, but the contract was forwarded to Air Jireh on July 23, 2013. The second problem with the contract was that it stated the subcontract was to follow the scope and work in accordance with the plans and specifications. Although Air Jireh submitted three (3) separate bids, the plans and specifications were never properly changed and included controls. As part of Air Jireh protocol, they will not submit submittals, shop drawings, or release PO information without having a signed contract with each job. Air Jireh could not sign the contract due to the above stated problems. Nonetheless, when Weaver & Jacobs presented their subcontract to a third-party after Air Jireh allegedly breached, the subcontract had a different commencement date and the plans and specs were changed.

## SUMMARY OF ARGUMENT

It is Appellants' position that the Trial Court has erred regarding its Judgment against AJS Corp., Air Jireh, and Sepulveda. First the Trial Court erred by granting a judgment against AJS, Corp. as there was no evidence of AJS Corp. at trial, in the Court's Findings of Fact and Conclusions of Law, nor in the party's stipulated facts. Second, the Trial Court has erred in concluding that a valid, enforceable contract was formed. A contract can only exist if there is mutual assent or "meeting of the minds" regarding the subject matter and essential terms of the contract. There was not an agreement to the terms of the contract. While Weaver & Jacobs thought certain details regarding controls and specs or commencement dates were not necessarily important, they were important to Appellants' to avoid liability. If they were not so

-4-

important, then why did Weaver & Jacobs change the third-party subcontract after Appellants allegedly breached? Third, the Trial Court erred in concluding that Air Jireh's bid offer represented an enforceable promise. To succeed on a claim of promissory estoppel, Appellants feel that the promise must be **clear** and **unambiguous** in its terms. As stated earlier, some material aspects of the alleged promise/contract were not clear. Weaver & Jacobs felt that they were not clear as well, which is why they changed the third-party subcontract. Fourth, the Trial Court erred in concluding that Weaver & Jacobs was entitled to relief under the DTPA. Texas allows a DTPA claim to run with a breach of contract claim when the Defendant's misrepresentation is made to induce the consumer into the transaction. However, there was never any evidence of Appellants misrepresenting any information to induce Weaver & Jacobs into the transaction. As a matter of fact, the evidence shows the contrary, that Appellants had every intention to perform according to their bids, as long as both sides were clear on the terms. Furthermore, Weaver & Jacobs, as a matter of law, is not even entitled to the protections afforded to Consumers under the DTPA because Weaver & Jacobs is not a consumer as the conflict arose from a written contract that was more than $100,000.00. The fact that every bid submitted by Appellants was over $100,000.00 removes Weaver & Jacobs from the protections under the DTPA. Fifth, the Trial Court erred in concluding that Sepulveda made false representations when submitting the resume and submitting the bid. The only evidence regarding the resume of AJS Corp., was that it was true and correct as to the services performed and that the company had been in business for the past twenty (20) years. There was never any controverting evidence. A company is allowed to perform under a d/b/a and take credit for the jobs. Furthermore, there is a lack of evidence to show that Appellants never intended to enter into a contract. The evidence actually shows that Appellants had every intention to enter into a contract, but at an agreement to the terms, which there was never an agreement. Lastly, the Trial

Court erred in awarding attorney fees to Weaver & Jacobs. The fees were not reasonable and necessary. Furthermore, the fees were not segregated as they should have been because there were multiple causes of action that were not so interrelated as required. An award of attorney's fees erroneously based upon evidence of unsegregated fees requires a remand.

## ARGUMENT

**Issue 1:** The Trial Court erred in its Findings of Fact and Conclusions of law and in granting a judgment against AJS Corp.

## ARGUMENT & AUTHORITIES

On March 5, 2015, the Honorable Kemper Stephen Williams signed a Final Judgment in favor of Weaver & Jacobs and against all Appellants. However, in the Findings of Fact and Conclusions of Law signed by the Court on March 20, 2015, AJS Corp. is never listed or even referred to, only Air Jireh and Sepulveda are named. Furthermore, AJS Corp. was never a party in the Joint Statement of Stipulated Facts, nor was it listed in said Joint Statement of Stipulated Facts. Lastly, there was no evidence at trial to implicate AJS, Corp., only Air Jireh. In considering a no evidence point of error, this court must consider only evidence and inferences that support the finding and disregard all contrary evidence and inferences. *Dolenz v. Continental National Bank*, 620 S.W.2d 572, 576 (Tex. 1985); *Oxoco Exploration & Prod., Inc. v. Arrowhead Drilling Corp.*, No. A14 86 181 CV, 1986 WL 13431, at *1 (Tex. App. Nov. 20, 1986). There was no evidence, nor were there any inferences as to AJS Corp. and as such it was error for the Court to grant a judgment against AJS, Corp. without any evidence.

**Issue 2:** The Trial Court erred in ruling that a valid, enforceable contract was formed between Weaver & Jacobs and Air Jireh.

## ARGUMENT & AUTHORITIES

To establish the existence of an enforceable contract, a party must prove (1) an offer, (2) acceptance of the offer, (3) mutual assent or "meeting of the minds" regarding the subject matter and essential terms of the contract, and (4) consideration, or mutuality of obligations. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007); *Harco Energy, Inc. v. Re-Entry People, Inc.*, 23 S.W.3d 389, 392 (Tex. App.-Amarillo, no pet.) (citing *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 408-09 (Tex. 1997)). To form a contract, the offer must be clear and definite. *Gulf Coast Farmers Co-op v. Valley Co-op Oil Mill*, 572 S.W.2d 726, 737 (Tex. Civ. App.-Corpus Christi 1978). A court, in deciding whether a contract was made, should determine from the facts that all essential terms thereof have been met. *Id.* The offer from Weaver & Jacobs was anything but clear and definite, except of course to Weaver & Jacobs. RR 32:1-5; 33:11-34:22 Three different bids were submitted, all with the alleged date of June 26, 2013. RR 31:10-32:4. Likewise, there must be a clear and definite acceptance of all terms contained in the offer. *Id.* An acceptance must not change the terms of an offer. If it does, the offer is rejected. *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968). A material change in a proposed contract constitutes a counteroffer, which must be accepted by the other party. *Antonini v. Harris County Appraisal Dist.* 999 S.W.2d 608, 614 (Tex. App.-Houston [14th Dist.] 1999, no pet.). It is well established under Texas Law that the submission of a bid in response to an invitation for bids constitutes a formal offer to enter into a contract. *Lane & Nearn v. Warren*, 115 S.W. 903 (Tex. Civ. App. 1909, writ refused). The submission of a second revised bid constituted an offer that Weaver & Jacobs had to accept. Weaver & Jacobs claims to have accepted the bid and memorialized the acceptance by sending over a subcontract on July 23, 2014. RR 23:5-20. It was this very subcontract that made Weaver & Jacob's alleged

acceptance unclear and not definite. Mutuality of obligation refers to the parties' mutual understanding and assent to the expression of their agreement. *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex. App.-Dallas 199, pet. denied.). The parties must agree to the same thing, in the same sense, at the same time. The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did. *Copeland v. Alsobrook*, 3 S.W.2d 598, 604 (Tex. App.-San Antonio 1999, pet. denied). The record is clear that the parties were not on the same page. Sepulveda constantly refers to the fact that no terms were agreed upon. RR 75:24-76:6; 76:20-21; 79:25-80:4; 80:16-23. Additionally, to further corroborate the fact there was not mutual understanding between the parties we look to the commencement date on both the subcontracts with Air Jireh and the Third-party subcontract. Weaver & Jacobs admits that the commencement date of the subcontracts sent to Air Jireh stated June 25, 2015, despite the subcontract being created on July 23, 2015. RR 30:7-23. Furthermore Weaver & Jacobs believes that the commencement date is not important. RR 30:11-21. However, on the third party subcontract to Crossroads Mechanical that was necessary after Air Jireh allegedly breached the contract, the commencement date stated August 20, 2013 while the subcontract was dated July 23, 2015. RR 32:13-24. On the third party subcontract to Crossroads Mechanical, changes were made to the contract to make sure the terms were clear. RR 33:8-22. Again the fact that Weaver & Jacobs had to make changes to the subcontract when sending it to Crossroads Mechanical to make sure the parties were clear further corroborates the fact that there was no mutual agreement between Weaver and Jacobs and Air Jireh and thus no contract.

Lastly, there could not have been a valid, enforceable contract due to the statute of frauds. Under the statute of frauds, a promise or agreement is not enforceable unless the promise

or agreement, or a memorandum of it, is in writing; and signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him. Tex. Bus. & Com. Code Ann. § 26.01. In this case, there was never a written agreement that was signed by any of the Appellants. A bid was submitted, however, it was never accepted. Rather, a subcontract was sent by Weaver & Jacobs that contained material changes and thus constituted a counter-offer as stated previously. There was never any evidence of a written contract signed by AJS Corp., Air Jireh, or Sepulveda. Conversely, the subcontract with the third-party contained all required signatures unlike this contract.

**Issue 3:** The Trial Court erred in ruling that Air Jireh's bid represented Air Jireh's enforceable promise to perform the Work in exchange for the amount of $125,971.00; that Air Jireh reasonably foresaw that Weaver & Jacobs would act in reliance on the promise; and that Weaver & Jacobs did rely on the promise to its detriment.

## ARGUMENT & AUTHORITIES

Under Texas law, a plaintiff alleging promissory estoppel must establish (1) a promise; (2) foreseeable reliance thereon by the promisor; (3) substantial reliance thereon by the promisee. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1993). Meanwhile, other Circuits have held that in order to succeed on a claim of promissory estoppel, a plaintiff must prove: (1) a promise **clear** and **unambiguous** in its terms; (2) reliance by the party to whom the promise is made; (3) reliance both reasonable and foreseeable; and (4) injury due to the reliance. *Premium Hospitality, L.L.C. v. Astra Capital Funding*, CIV.A. 12-0779, 2014 WL 896807 (E.D. La. Mar. 6, 2014). For the reasons stated under Appellants' Argument & Authorities for Issue 2, it is Appellants' position that the alleged promise by Appellants lacked the clarity necessary for

-9-

Weaver & Jacobs to claim promissory estoppel, thus barring Weaver & Jacobs from claiming promissory estoppel.

**Issue 4:** The Trial Court erred in ruling that Weaver & Jacobs is entitled to all protections afforded to consumers under the DTPA.

### ARUGMENT & AUTHORITIES

The Texas Supreme Court has made clear that "[a]n allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Hernandez v. Ikon Office Solutions, Inc.*, 306 F. App'x 180, 182 (5th Cir. 2009); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex.2006) (quoting *Ashford Dev., Inc. v. USLife Real Estate Serv. Corp.*, 661 S.W.2d 933, 935 (Tex.1983)). Texas law allows DTPA claims alongside contract claims when the defendant makes an initial misrepresentation that was known at the time of the transaction and made to induce the consumer into the transaction. *Id.* In the present case, the evidence is to the contrary in that there was never a misrepresentation for Weaver & Jacobs to rely upon. There was no evidence presented that showed that Sepulveda submitted the bid to induce Weaver & Jacobs into the transaction. Sepulveda testified that he sent requests for submittals to M&M Metals, Mechanical Reps, and Professional Air Balance indicating his intention to enter into a transaction. RR 78:2-16; 79:21-24. Furthermore, Sepulveda informed Chris Brzozowski of Weaver & Jacobs that Air Jireh would be willing to perform the work on this project, once the two sides could agree as to the terms. RR 79:25-80:1-4. Not once, but twice did Sepulveda testify regarding the Appellants' intention to perform according to the bids submitted. It was not until August 15, 2015, wherein Sepulveda acknowledged that witout a signed, written contract Air Jireh would not engage in the

project. RR 80:16-23. Additionally, the testimony of Kristen Parisher and Javier Martinez corroborate the fact that Sepulveda and Air Jireh intend to perform the work, but not without the proper understanding between the parties. According to Kristen Parisher, there was a concern over liability if the terms of the subcontract were not correct. RR 85:18-87:6.

There was never any testimony regarding the DTPA and Plaintiff failed to prove its cause of action under the DTPA. Weaver & Jacobs does not constitute a "consumer" under the DTPA due to the type of transaction involved. Further, the Deceptive Trade Practices Act does not apply to a claim arising out of a written contract if the contract relates to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000.00. Tex. Bus. & Com. Code Ann. § 17.49. The testimony throughout trial was regarding a written subcontract. RR 23:18-20; 42:13-20. Additionally, the dispute arose out of three different bids that were submitted to Weaver & Jacobs. All three (3) bids were for an amount greater than $100,000.00. RR 12:10-14; 41:23-42:5. The bid that Weaver & Jacobs allegedly relied upon was for the amount of $125,971.00 RR 32:4-5. Accordingly, the DTPA does not apply specifically to this transaction and Weaver & Jacobs is not entitled to **any** relief under the DTPA.

**Issue 5:** The Trial Court erred in ruling that Sepulveda submitted a copy of Air Jireh's resume which contained several representations; that these representations were false; that Sepulveda made these representations with knowledge of their falsity or recklessly, as positive assertions, without knowledge of their truth; and that Weaver & Jacobs relied on Sepulveda's false representations. (Argument made only for purposes of continuity and NOT to assert any relief on behalf of Sepulveda who has filed a Notice of Bankruptcy with the Court)

## ARGUMENT & AUTHORITIES

A fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, *which was intended to be acted upon,* which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 47-48 (Tex. 1998); S*ears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex. 1994); *48 *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); *see also Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977). First, a resume was never submitted for Air Jireh. The resume submitted was for AJS Corp. Javier Martinez, the president of AJS, Corp., clearly states that "this is a resume that I myself generated for Jireh Services Corporation." RR 62:3-4. For arguments sake, even if the resume was for Air Jireh, there was no evidence that the jobs on the resume were not performed. Javier Martinez testified that the resume is "true and correct as to the services performed by Air Jireh Services Corp." RR 61:24-62:2. Javier Martinez also testified that the company been in business for the past twenty (20). RR 57:9-58:4. There is no testimony to rebut the statements of Javier Martinez that the jobs listed on the resume were actually performed, that the resume was incorrect, that the resume's recitation of "most recent jobs" were false, or that the company had been in business for over twenty (20) years. Although the jobs listed on the resume, were some of the same jobs listed on the website of AC Plumbing Specialist, Javier Martinez additionally testified that the entity Air Jireh, also goes by the name of AC Plumbing Specialist. RR 61:15-18.; RR 66:19-23. A necessary element of fraud must involve a false representation. As stated above, there is not any evidence to the contrary that the resume submitted by Sepulveda was false. The Trial Court erred in ruling that the resume submitted by Sepulveda

was false. To his knowledge, they were true as he was given them by his employer, Javier Martinez, who verified through testimony that they were in fact true. Sepulveda, though perhaps unaware of whether all the jobs were accurate, had no reason to believe that they were false.

**Issue 6:** The Trial Court erred in ruling that Sepulveda submitted the bid to Weaver & Jacobs, in which he represented that Air Jireh would perform the Work in exchange for the sum of $125,971.00; that these representations were false; that Sepulveda made these representations with knowledge of their falsity or recklessly, as positive assertions, without knowledge of their truth; and that Weaver & Jacobs relied on Oskar Sepulveda, Jr's false representations. (Argument made only for purposes of continuity and NOT to assert any relief on behalf of Sepulveda who has filed a Notice of Bankruptcy with the Court)

## ARGUMENT & AUTHORITIES

A fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, *which was intended to be acted upon,* which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 47-48 (Tex. 1998); S*ears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex. 1994); *48 DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 688 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991); *see also Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977). However, the mere failure to perform a contract is not evidence of fraud. *Schindler v. Austwell Farmers Coop.,* 841 S.W.2d 853, 854 (Tex.1992). The Court in *Formosa Plastics* held that evidence had to be presented that representations were made with the intent to deceive and with no intention of performing as represented. *See Spoljaric,* 708 S.W.2d at 434; *Stanfield,*

-13-

462 S.W.2d at 272; *see also T.O. Stanley Boot Co.,* 847 S.W.2d at 222; Moreover, the evidence presented must be relevant to Formosa's intent at the time the representation was made. *Spoljaric,* 708 S.W.2d at 434.

Weaver & Jacobs fails to meet this burden. Although the Court may have found that Air Jireh failed to performed the contract, there was no evidence presented that showed that Air Jireh, through Sepulveda, submitted the bid with an intent to deceive and with no intention of performing as represented. As a matter of the fact, the evidence states the contrary. Sepulveda testified that he sent requests for submittals to M&M Metals, Mechanical Reps, and Professional Air Balance. RR 78:2-16; 79:21-24. Additionally, Sepulveda informed Chris Brzozowski of Weaver & Jacobs that Air Jireh would be willing to perform the work on this project, once the two sides could agree as to the terms. RR 79:25-80:4. Not once, but twice did Sepulveda testify of Appellants' intention to perform according to the bids submitted. It was not until August 15, 2015, wherein Sepulveda of Air Jireh refused to perform work on the project. RR 80:16-23. Additionally, the testimony of Kristen Parisher and Javier Martinez corroborates the fact that Sepulveda and Air Jireh intend to perform the work, but not without the proper understanding between the parties. According to Kristen Parisher, there was a concern over liability if the terms of the subcontract were not correct. RR 85:18-87:6

**Issue 7:** The Trial Court erred in ruling that Sepulveda in the course and scope of his employment, represented to Weaver & Jacobs that Air Jireh had twenty (20) years experience , that Air Jireh had performed certain jobs, and that Air Jireh would perform the Work in exchange for $125,971.00; that these representations were false; that Sepulveda, in the course and scope of his employment, intended that Weaver & Jacobs to rely on said representations; that Sepulveda failed to exercise reasonable care or competence in obtaining and communicating the representations on behalf of Air Jireh.

-14-

## ARGUMENT & AUTHORITIES

To establish a cause of action for negligent misrepresentation, Plaintiff must prove the following elements: (1) the representation was made in the course of Defendant's business; (2) false information was supplied for the guidance of others in their business; (3) Defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) Plaintiff suffered pecuniary loss by justifiably relying on the representation. *Daldav Associates, L.P. v. Lebor*, 391 F. Supp. 2d 472, 476 (N.D. Tex. 2005); *See Dallas Firefighters Ass'n v. Booth Research Group, Inc.*, 156 S.W.3d 188, 194 (Tex.App.-Dallas 2005); *Airborne Freight Corp. v. C.R. Lee Enters.*, 847 S.W.2d 289 (Tex.App.-El Paso 1993, writ denied). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex.1992).

Again, for the reasons stated in the Argument & Authorities under Issue 6, there was no evidence presented that showed that Sepulveda submitted the bid with an intent to deceive and with no intention of performing as represented on behalf of Air Jireh. As a matter of the fact, the evidence states the contrary. Additionally, there is no testimony to rebut the statements of Javier Martinez that Air Jireh actually performed the jobs listed on the resume, that the resume was incorrect, that the resume's recitation of Air Jireh's "most recent jobs" were false, or that Air Jireh had been in business for over twenty (20) years.

**Issue 8:** The Trial Court erred in awarding attorney fees to Weaver & Jacobs.

## ARGUMENT & AUTHORITIES

As a general rule, the party seeking to recover attorney's fees carries the burden of proof. See, e.g., Kimbrough v. Fox, 631 S.W.2d 606, 609 (Tex.App.—Fort Worth 1982, no writ);

-15-

Corpus Christi Dev. Corp. v. Carlton, 644 S.W.2d 521, 523 (Tex.App.—Corpus Christi 1982, no writ); Bavarian Autohaus, Inc. v. Holland, 570 S.W.2d 110, 116 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ). The trial court may award those fees that are "reasonable and necessary" for the prosecution of the suit. *See, e.g., Green Tree Acceptance, Inc. v. Pierce, 768 S.W.2d 416, 425 (Tex.App.—Tyler 1989, no writ); Flint & Assoc. v. Intercontinental Pipe & Steel, Inc., 739 S.W.2d 622, 624 (Tex.App.—Dallas 1987, writ denied); Rosas v. Bursey, 724 S.W.2d 402, 410–11 (Tex.App.—Fort Worth 1986, no writ); Graves v. Sommerfeld, 618 S.W.2d 952, 954–55 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.).* It is Appellant's position that the fees in this case are not reasonable and necessary as they are more than the actual judgment awarded. Furthermore, attorney fees were granted based upon Section 38.001 of the Texas Civil Practice and Remedies Code and Section 17.50 of the Texas Business and Commerce Code. It is appellant's position that Weaver & Jacobs is not entitled to any protections afforded to consumers under the DTPA and thus the attorney fees must be segregated. Attorney's fees attributable to separate causes of action must be segregated unless the claims arise from the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. *Villasenor v. Villasenor*, 911 S.W.2d 411, 420 (Tex. App. 1995). For argument's sake, assuming that the separate causes of action alleged by Weaver & Jacobs arise from the same transaction, they are not so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. A cause of action under the DTPA requires a party to be a consumer, which is not required under Breach of Contract, nor Promissory Estoppel. Thus, additional proof is required for a DTPA transaction than is required under breach of contract and promissory estoppel. As a result of this segregation, an award of attorney's fees erroneously based upon evidence of unsegregated fees requires a remand. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991)

## PRAYER

For the foregoing reasons stated herein above, Appellants respectfully request that the Court of Appeals reverse the Order of the Trial Court. Appellee requests all other appropriate relief to which they are entitled both at equity and in law.

Respectfully Submitted,
Law Office of Lee Hernandez
A Professional Corporation
4100 NW Loop 410, Suite 100
San Antonio, Texas 78229
Tel.: 210.735.4202
Fax: 210.735.4231

By:_____
Rene Zarazua
State Bar No. 24077285
Attorney for Appellants
rene@leehernandez.com

## CERTIFICATE OF COMPLIANCE

I certify that the above document is in compliance with the Texas Rules of Appellate Procedure 9.4(2), (3). This document has a total of 5,348 words.

## CERTIFICATE OF SERVICE

On the 23rd day of November, 2015, in compliance with the Texas Rules of Appellate Procedure 9.5(b), I, the undersigned counsel, served this document on the following counsel of record electronically through the electronic filing manager:

FORD NASSEN & BALDWIN P.C.
c/o Christopher Scifres
111 Congress, Suite 1010
Austin, Texas 78701
Telephone: (512) 236-0009
Facsimile: (512) 236-0682
cascifres@fordnassen.com


Rene Zarazua

# APPENDIX

Final Judgment.................................................................................. Tab A

Findings of Fact and Conclusions of Law........................................ Tab B

Tex. Bus. & Com. Code § 17.46(a)................................................. Tab C

Tex. Bus. & Com. Code Ann. § 17.49............................................. Tab D

Tex. Bus. & Com. Code Ann. § 26.01............................................. Tab E

Air Jireh Bid No. 1........................................................................... Tab F

Air Jireh Bid No. 2........................................................................... Tab G

Air Jireh Bid No. 3........................................................................... Tab H

Subcontract - Air Jireh.................................................................... Tab I

Subcontract - Crossroads Mechanical, Inc...................................... Tab J

# TAB
# A

Cause No. 13-10-22,801

| | | |
|---|---|---|
| WEAVER & JACOBS CONSTRUCTORS, INC. | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | |
| | § | DEWITT COUNTY, TEXAS |
| AIR JIREH SERVICES CORPORATION, HVAC PLUMBING SPECIALIST CORPORATION A/K/A HVAC PLUMBING SPECIALIST INC D/B/A AIR JIREH SERVICE A/K/A AIR JIREH SERVICES and OSKAR SEPULVEDA, JR., | § § § § § § | |
| Defendants. | § § | 24TH JUDICIAL DISTRICT |

## AGREED FINAL JUDGMENT

On February 2, 2015, this case was called for trial. Plaintiff, WEAVER & JACOBS CONSTRUCTORS, INC., and Defendants, AIR JIREH SERVICES CORPORATION, HVAC PLUMBING SPECIALIST CORPORATION a/k/a HVAC PLUMBING SPECIALIST INC d/b/a AIR JIREH SERVICE a/k/a AIR JIREH SERVICES, and OSKAR SEPULVEDA, JR. (collectively, the "DEFENDANTS"), announced ready for trial. The matters in controversy between WEAVER & JACOBS CONSTRUCTORS, INC. and the DEFENDANTS were presented to the Court.

Upon review of the evidence, the Court granted judgment in favor of WEAVER & JACOBS CONSTRUCTORS, INC., and against the DEFENDANTS.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that WEAVER & JACOBS CONSTRUCTORS, INC. have and recover, jointly and severally, of and from the DEFENDANTS, AIR JIREH SERVICES CORPORATION, HVAC PLUMBING SPECIALIST CORPORATION a/k/a HVAC PLUMBING SPECIALIST INC d/b/a AIR JIREH SERVICE a/k/a AIR JIREH SERVICES, and OSKAR SEPULVEDA, JR., the sum of Sixteen Thousand Five

Hundred Fifty-Six and 00/100 Dollars ($16,556.00), with interest thereon at the rate of five percent (5%) per year, from the date the final judgment is signed by the Court, until paid.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that WEAVER & JACOBS CONSTRUCTORS, INC. have and recover, jointly and severally, of and from the DEFENDANTS, AIR JIREH SERVICES CORPORATION, HVAC PLUMBING SPECIALIST CORPORATION a/k/a HVAC PLUMBING SPECIALIST INC d/b/a AIR JIREH SERVICE a/k/a AIR JIREH SERVICES, and OSKAR SEPULVEDA, JR., pre-judgment interest at the rate of five percent (5%) per year, accruing from the date the lawsuit was filed, October 3, 2013, until the day before the date on which the final judgment is signed by the Court. As of February 17, 2015, pre-judgment interest has accrued in the amount of $1,138.51, and will continue to accrue at a rate of $2.27 per day until the day before the date on which the final judgment is signed by the Court.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that WEAVER & JACOBS CONSTRUCTORS, INC. have and recover of and from, jointly and severally, AIR JIREH SERVICES CORPORATION and HVAC PLUMBING SPECIALIST CORPORATION a/k/a HVAC PLUMBING SPECIALIST INC d/b/a AIR JIREH SERVICE a/k/a AIR JIREH SERVICES its reasonable and necessary attorney fees in the amount of Twenty-One Thousand Three Hundred Fifty-Four and 00/100 Dollars ($21,354.00). In addition, WEAVER & JACOBS CONSTRUCTORS, INC. shall conditionally recover the sum of Fifteen Thousand and 00/100 Dollars ($15,000.00) in the event WEAVER & JACOBS CONSTRUCTORS, INC. prevails on appeal to the court of appeals, and further conditionally recover Ten Thousand and 00/100 Dollars ($10,000.00) in the event the Supreme Court of Texas accepts an appeal from the court of appeals and WEAVER & JACOBS CONSTRUCTORS, INC. prevails on such appeal.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that WEAVER & JACOBS CONSTRUCTORS, INC. have and recover of and from, jointly and severally, AIR JIREH SERVICES CORPORATION and HVAC PLUMBING SPECIALIST CORPORATION a/k/a HVAC PLUMBING SPECIALIST INC d/b/a AIR JIREH SERVICE a/k/a AIR JIREH SERVICES post-judgment interest at the rate of five percent (5%) per year, compounded annually, on the amount of $39,048.51, which represents the judgment amount of $16,556.00 plus pre-judgment interest in the amount of $1,138.51 and reasonable and necessary attorney fees in the amount of $21,354.00, accruing from the date the final judgment is signed by the Court and continuing until the date on which the judgment is satisfied, at the rate of $5.35 per day.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that WEAVER & JACOBS CONSTRUCTORS, INC. have and recover of and from OSKAR SEPULVEDA, JR. post-judgment interest at the rate of five percent (5%) per year, compounded annually, on the amount of $17,694.51, which represents the judgment amount of $16,556.00 plus pre-judgment interest in the amount of $1,138.51, accruing from the date the final judgment is signed by the Court and continuing until the date on which the judgment is satisfied, at the rate of $2.42 per day.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that WEAVER & JACOBS CONSTRUCTORS, INC. shall be entitled to have all writs of execution and other process necessary to enforce these judgments against each of the DEFENDANTS, jointly and severally.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs of court be and hereby are taxed against the DEFENDANTS, jointly and severally.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all relief not expressly granted is hereby **DENIED**. This is a **FINAL JUDGMENT and disposes of all claims and parties.**

SIGNED this 5th day of _March_, 2015.

_____
Judge Kemper Stephen Williams

**Approved as to Form and Substance:**

FORD NASSEN & BALDWIN P.C.                    LAW OFFICE OF LEE HERNANDEZ

By:_____          By:_____
    Christopher A. Scifres                          Rene G. Zarazua
    Texas State Bar No. 24088374                    Texas State Bar No. 24077285
    Attorney for Plaintiff                          Attorney for Defendants

**FILED**

at 9:30 o'clock A M

MAR 1 0 2015

TABETH GARDNER, Clerk
Dist. Court DeWitt County, Texas
By_____ Deputy

AGREED FINAL JUDGMENT - Page 4                                    138221.1/2845.002

# TAB
# B

| | | |
|---|---|---|
| WEAVER & JACOBS CONSTRUCTORS, INC. | § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| | § | |
| v. | § | |
| | § | DEWITT COUNTY, TEXAS |
| AIR JIREH SERVICES CORPORATION, HVAC PLUMBING SPECIALIST CORPORATION A/K/A HVAC PLUMBING SPECIALIST INC D/B/A AIR JIREH SERVICE A/K/A AIR JIREH SERVICES and OSKAR SEPULVEDA, JR., | § § § § § § § | |
| Defendants. | § | 24TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 2, 2015, this case was called for trial. All parties appeared through counsel and announced ready. The case proceeded to trial. Based on the evidence at trial, the briefs, the arguments of counsel, and the parties' joint statement of stipulated facts, the Court makes the following findings of fact and conclusions of law, pursuant to Rule 296 of the Texas Rules of Civil Procedure.

### I. FINDINGS OF FACT

1. Weaver & Jacobs is a Texas corporation in good standing and authorized to do business in the State of Texas.

2. HVAC Plumbing Specialist Corporation a/k/a HVAC Plumbing Specialist Inc d/b/a Air Jireh Service a/k/a Air Jireh Services ("Air Jireh") is a Texas corporation authorized to do business in the State of Texas.

3. Air Jireh uses interchangeably the names "HVAC Plumbing Specialist Corporation," "HVAC Plumbing Specialist Inc," "Air Jireh Service," "Air Jireh Services," and "AC Plumbing Specialists."

---

4.  Oskar Sepulveda, Jr. ("Sepulveda") is an individual who resides in Texas.

5.  On April 8, 2013, Weaver & Jacobs entered into a prime contract with Taft Independent School District ("TISD") for the Taft Independent School District High School Improvements, Taft, Texas (the "Project").

6.  TISD is the owner of the Project, and Weaver & Jacobs agreed to act as the Construction Manager at Risk for the construction of a new front office, among other improvements.

7.  Weaver & Jacobs issued a Notice of Requests for Proposals from Subcontractors and Suppliers (the "Requests for Proposals").

8.  In the Requests for Proposals, Weaver & Jacobs requested bid offers from subcontractors and suppliers indicating the price for which they would be willing to perform certain scopes of work on, or to supply materials to, the Project.

9.  All bid offers were required to be submitted to Weaver & Jacobs by June 26, 2013.

10.  On June 26, 2013, at 2:09 p.m., Sepulveda, who is a project manager for Air Jireh, sent an e-mail to Weaver & Jacobs.

11.  Air Jireh attached to its June 26, 2013, e-mail a bid offer (the "Original Bid") to furnish labor and materials for the heating, ventilation, and air conditioning systems for the Project (the "Work") in exchange for the sum of $147,732.00.

12.  The Original Bid included the cost for certain digital controls (the "Digital Controls") to be installed as part of the Work.

13.  Air Jireh sent with the Original Bid a copy of Air Jireh's résumé.

14.  The Digital Controls were a single-source specification, which means that every offer to perform the work submitted to Weaver & Jacobs was to include the Digital Controls at the same cost of $23,561.00.

15.     Sepulveda concluded his June 26, 2013, e-mail by thanking Weaver & Jacobs for the "opportunity" and expressing that Air Jireh "look[ed] forward to working for [Weaver & Jacobs] in the near future."

16.     After Weaver & Jacobs received and compiled all of the subcontractor offers for the entire Project, it was necessary for Weaver & Jacobs to engage in value engineering to reduce the Project's price.

17.     On June 26, 2013, at 2:29 p.m., Weaver & Jacobs sent Air Jireh an e-mail asking Air Jireh to confirm that it had included in its Original Bid the Digital Controls at a price of "around $25k."

18.     On June 26, 2013, at 2:56 p.m., Air Jireh sent Weaver & Jacobs an e-mail confirming that the Digital Controls were included in its Original Bid at a price of $24,986.00.

19.     As part of a comprehensive budget reduction plan, Weaver & Jacobs and TISD agreed to replace the Digital Controls with less expensive wall-mounted thermostats (the "Thermostats").

20.     On or about June 26, 2013, Weaver & Jacobs submitted its guaranteed maximum price (the "GMP") to TISD.

21.     On July 7, 2013, at 4:53 p.m., Weaver & Jacobs sent Air Jireh an e-mail informing Air Jireh that Weaver & Jacobs was replacing the Digital Controls with the Thermostats.

22.     On July 7, 2013, at 6:40 p.m., Air Jireh sent Weaver & Jacobs an e-mail indicating that the Original Bid included the Digital Controls at a price of $23,561.00 and three Thermostats at a price of $475 each.

23.     On July 9, 2013, Air Jireh submitted to Weaver & Jacobs a revised bid offer in the amount of $132,670.00 (the "Revised Bid"). However, the Revised Bid's price did not properly recognize the full deduction for substituting the Thermostats for the Digital Controls.

24. Air Jireh agreed to submit a bid offer in the amount of $125,971.00 (the Original Bid of $147,732.00 minus $23,561.00 for the Digital Controls plus $1,800.00 for the Thermostats).

25. Weaver & Jacobs informed Air Jireh that it would accept Air Jireh's $125,971.00 offer and would issue a subcontract in the amount of $125,971.00 to Air Jireh to memorialize their agreement.

26. On July 16, 2013, Air Jireh sent Weaver & Jacobs an e-mail indicating that Air Jireh had "revised [the] HVAC proposal with programmable t-stats in lieu of the controls[.]"

27. Attached to Air Jireh's July 16, 2013, e-mail was Air Jireh's corrected bid offer (the "Corrected Bid Offer"), which properly substituted the cost of the Digital Controls with the cost of the Thermostats, but which was incorrectly dated "June 26, 2013."

28. In the Corrected Bid Offer, Air Jireh offered to perform the Work in exchange for amount of $125,971.00.

29. Air Jireh's July 16, 2013, e-mail concluding by thanking Weaver & Jacobs for "the opportunity" and stating that Air Jireh "look[ed] forward to working for [Weaver & Jacobs]."

30. Weaver & Jacobs accepted the Corrected Bid Offer.

31. On July 23, 2013, Weaver & Jacobs sent Air Jireh a subcontract in the amount of $125,971.00 (the "Subcontract"), which communicated Weaver & Jacobs' acceptance of the Corrected Bid Offer.

32. The following provision was included in the Subcontract on page six: "EXCLUSIONS: Per quote dated 6/26/13."

33. On August 5, 2013, Weaver & Jacobs sent an e-mail to all of the Project's subcontractors, including Air Jireh, which stated that each recipient had recently contracted with Weaver & Jacobs.

34.    In its August 5, 2013, e-mail, Weaver & Jacobs asked Air Jireh to provide submittals or shop drawings to Weaver & Jacobs by August 19, 2013, for the materials and equipment it would be furnishing to the Project (the "Request for Submittals"), again communicating Weaver & Jacobs' acceptance of the Corrected Bid Offer.

35.    On or about August 10, 2013, after not receiving a response to the August 5, 2013, request for submittals, Chris Brzozowski ("Brzozowski"), Weaver & Jacobs' project manager, contacted Air Jireh via telephone to seek assurances that Air Jireh still planned to perform the Work. During the telephone conversation, Sepulveda represented to Weaver & Jacobs that Air Jireh would perform the Work.

36.    On or about August 15, 2013, Brzozowski again contacted Air Jireh via telephone and spoke with Sepulveda. During that telephone conversation, Sepulveda represented that Air Jireh would neither execute the Subcontract nor perform the Work as it had promised in the Corrected Bid Offer.

37.    Weaver & Jacobs was forced to enter into a subcontract with a third party to perform the Work for the amount of $142,347.00, which was $16,556.00 more than the amount agreed to by Air Jireh in the Corrected Bid Offer for the performance of the Work.

38.    On or about January 23, 2013, HVAC Plumbing Specialist Inc filed with the Bexar County Clerk an assumed name certificate whereby HVAC Plumbing Specialist Inc would conduct business as "Air Jireh Service" (the "Assumed Name Certificate"). In the Assumed Name Certificate, the address for HVAC Plumbing Specialist Inc is listed as "5122 Leon Hardt, San Antonio, TX 78233." Richard B. Carr signed the Assumed Name Certificate as "officer, general partner, manager, member, representative, or attorney-in-fact."

## II. CONCLUSIONS OF LAW

39.     A valid, enforceable contract was formed between Weaver & Jacobs and Air Jireh after Weaver & Jacobs accepted Air Jireh's Corrected Bid Offer to perform the Work in exchange for the sum of $125,791.00. Air Jireh breached its contract with Weaver & Jacobs by refusing to perform the Work. Air Jireh's breach of contract caused injury to Weaver & Jacobs in the amount of $16,556.00. Air Jireh failed to establish by a preponderance of the evidence that it has any valid excuse or defense to liability for its material breach of its contractual obligations to Weaver & Jacobs.

40.     Air Jireh's Corrected Bid Offer in the amount of $125,971.00 represented Air Jireh's enforceable promise to perform the Work in exchange for that amount. Air Jireh reasonably foresaw that Weaver & Jacobs would act in reliance on the promise, and Weaver & Jacobs did, in fact, rely on the promise to its detriment in calculating the GMP for the Project. As a direct and proximate result of Air Jireh's refusal to perform the Work as promised, Weaver & Jacobs was damaged in the amount of $16,556.00. Air Jireh failed to establish by a preponderance of the evidence that it has any valid excuse or defense to liability for its failure to fulfill its promise to perform the Work.

41.     Weaver & Jacobs is a consumer under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41 *et seq.* (the "DTPA"), because it is a corporation that sought to purchase from Air Jireh goods and services needed to perform the Work on the Project. Weaver & Jacobs is thus entitled to all protections afforded to consumers under the DTPA. Air Jireh can be sued under the DTPA because it sells and installs HVAC systems and provides service for existing systems. By offering to perform the Work on the Project in exchange for the sum of $125,971.00, and then orally repudiating its proposal, Air Jireh engaged in false, misleading, and deceptive acts in the conduct of its trade and in violation of Tex. Bus. & Com. Code § 17.46(a). Air Jireh's conduct constitutes false,

misleading, and deceptive acts and practices included in the "laundry list" of DTPA violations. Such "laundry list" violations include (1) advertising goods or services with the intent not to sell them as advertised and (2) representing that an agreement confers or involves rights, remedies, or obligations that it does not. Weaver & Jacobs relied on Air Jireh's false, misleading, and deceptive acts to its detriment by using Air Jireh's proposal to compute its GMP for the Project. Air Jireh's conduct forced Weaver & Jacobs to contract with another subcontractor at a substantially higher contract price than that which was promised by Air Jireh. Air Jireh is the producing cause of Weaver & Jacobs' damages in the amount of $16,556.00. Air Jireh failed to establish by a preponderance of the evidence that it has any valid excuse or defense to liability for its false, misleading, and deceptive acts.

42.     Sepulveda included with Air Jireh's Original Bid offer a copy Air Jireh's résumé. The résumé contained several false representations, including the assertion that Air Jireh had been doing business in the San Antonio area for the past 20 years and a recitation of certain "most recent jobs." Sepulveda also submitted the Corrected Bid Offer to Weaver & Jacobs, in which he represented that Air Jireh would perform the Work in exchange for the sum of $125,971.00. Further, on or about August 10, 2013, Sepulveda represented to Weaver & Jacobs that Air Jireh would perform the Work as promised in the Corrected Bid Offer. These representations were material in that Weaver & Jacobs relied on the representations to make its decision to accept Air Jireh's bid offer and would not have done so absent the representations. These representations were false. Sepulveda made these representations with knowledge of their falsity or recklessly, as positive assertions, without knowledge of their truth. Weaver & Jacobs relied on Sepulveda's false representations in calculating its GMP and, after Air Jireh refused to perform the Work, Weaver & Jacobs was forced to subcontract with a third party to perform the Work, resulting in damages to

Weaver & Jacobs in the amount of $16,556.00. Sepulveda failed to establish by a preponderance of the evidence that he has any valid excuse or defense to liability for his fraudulent representations to Weaver & Jacobs.

43.     Sepulveda represented to Weaver & Jacobs that Air Jireh had 20 years' experience doing business in the San Antonio area, that Air Jireh had performed certain recent jobs, and that Air Jireh would perform the Work in exchange for $125,971.00. These representations were false, and Sepulveda intended that Weaver & Jacobs rely on the representations. Sepulveda failed to exercise reasonable care or competence in obtaining and communicating these representations. Sepulveda intended that Weaver & Jacobs use these representations as guidance. Weaver & Jacobs reasonably and justifiably relied on Sepulveda's false representations to its detriment, resulting in damages to Weaver & Jacobs in the amount of $16,556.00. Sepulveda failed to establish by a preponderance of the evidence that he has any valid excuse or defense to liability for his negligent misrepresentations to Weaver & Jacobs.

44.     All conditions precedent to Weaver & Jacobs' entitlement to recovery have been performed, have occurred, or have been excused.

45.     Weaver & Jacobs has established by a preponderance of the evidence that the damages it incurred were reasonable and necessary to perform the Work after Air Jireh refused to execute the Subcontract or perform the Work. Weaver & Jacobs is entitled to recover from Air Jireh and Sepulveda, jointly and severally, damages in the amount of $16,556.00.

46.     Based on the acts and/or omissions of Air Jireh, Weaver & Jacobs is entitled, pursuant to Section 38.001 *et seq.* of the Texas Civil Practice and Remedies Code, Section 17.50(d) of the Texas Business and Commerce Code, and all other applicable laws, to recover from the Air Jireh its

reasonable attorney fees and costs incurred in connection with this dispute and in pursuing its claim, in the amount of $21,354.00.

47.     Weaver & Jacobs is entitled to recover from Air Jireh and Sepulveda, jointly and severally, pre-judgment interest at the rate of five percent (5%) per year, accruing from the date the lawsuit was filed, October 3, 2013, until the day before the date on which the final judgment is signed by the Court.

48.     Weaver & Jacobs is entitled to recover from Air Jireh post-judgment interest at the rate of five percent (5%) per year, compounded annually, on its damages of $16,556.00 plus any pre-judgment interest that has accumulated on such damages, and on its attorney fees of $21,354.00, accruing from the date the final judgment is signed by the Court and continuing until the date on which the judgment is satisfied.

49.     Weaver & Jacobs is entitled to recover from Sepulveda post-judgment interest at the rate of five percent (5%) per year, compounded annually, on its damages of $16,556.00 plus any pre-judgment interest that has accumulated on such damages, accruing from the date the final judgment is signed by the Court and continuing until the date on which the final judgment is satisfied.

50.     Weaver & Jacobs is entitled to have all writs of execution and other process necessary to enforce these judgments against each of the defendants.

51.     Any of the foregoing conclusions of law that are more properly considered findings of fact are also adopted by the Court as findings of fact.

SIGNED this 20th day of ___March___, 2015.

FILED
___ day of
at ___8:00___ o'clock __a__·M

MAR 2 3 2015

_____
Judge Kemper Stephen Williams

TABETH GARDNER, Clerk
Dist. Court, DeWitt County, Texas
By _____ Deputy

# TAB C

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted **Prior Version Limited on Preemption Grounds by** Lewkut v. Stryker Corp., S.D.Tex., Apr. 16, 2010

KeyCite Yellow Flag - Negative Treatment Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 2. Competition and Trade Practices
      Chapter 17. Deceptive Trade Practices (Refs & Annos)
        Subchapter E. Deceptive Trade Practices and Consumer Protection (Refs & Annos)

V.T.C.A., Bus. & C. § 17.46

§ 17.46. Deceptive Trade Practices Unlawful

Effective: September 1, 2015
Currentness

(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

  (1) passing off goods or services as those of another;

  (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

  (3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

  (4) using deceptive representations or designations of geographic origin in connection with goods or services;

  (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

  (6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand;

  (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

  (8) disparaging the goods, services, or business of another by false or misleading representation of facts;

(9) advertising goods or services with intent not to sell them as advertised;

(10) advertising goods or services with intent not to supply a reasonable expectable public demand, unless the advertisements disclosed a limitation of quantity;

(11) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions;

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

(14) misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction;

(15) basing a charge for the repair of any item in whole or in part on a guaranty or warranty instead of on the value of the actual repairs made or work to be performed on the item without stating separately the charges for the work and the charge for the warranty or guaranty, if any;

(16) disconnecting, turning back, or resetting the odometer of any motor vehicle so as to reduce the number of miles indicated on the odometer gauge;

(17) advertising of any sale by fraudulently representing that a person is going out of business;

(18) advertising, selling, or distributing a card which purports to be a prescription drug identification card issued under Section 4151.152, Insurance Code, in accordance with rules adopted by the commissioner of insurance, which offers a discount on the purchase of health care goods or services from a third party provider, and which is not evidence of insurance coverage, unless:

(A) the discount is authorized under an agreement between the seller of the card and the provider of those goods and services or the discount or card is offered to members of the seller;

(B) the seller does not represent that the card provides insurance coverage of any kind; and

(C) the discount is not false, misleading, or deceptive;

(19) using or employing a chain referral sales plan in connection with the sale or offer to sell of goods, merchandise, or anything of value, which uses the sales technique, plan, arrangement, or agreement in which the buyer or prospective buyer is offered the opportunity to purchase merchandise or goods and in connection with the purchase receives the seller's promise or representation that the buyer shall have the right to receive compensation or consideration in any form for furnishing to the

seller the names of other prospective buyers if receipt of the compensation or consideration is contingent upon the occurrence of an event subsequent to the time the buyer purchases the merchandise or goods;

(20) representing that a guaranty or warranty confers or involves rights or remedies which it does not have or involve, provided, however, that nothing in this subchapter shall be construed to expand the implied warranty of merchantability as defined in Sections 2.314 through 2.318 and Sections 2A.212 through 2A.216 to involve obligations in excess of those which are appropriate to the goods;

(21) promoting a pyramid promotional scheme, as defined by Section 17.461;

(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced;

(23) filing suit founded upon a written contractual obligation of and signed by the defendant to pay money arising out of or based on a consumer transaction for goods, services, loans, or extensions of credit intended primarily for personal, family, household, or agricultural use in any county other than in the county in which the defendant resides at the time of the commencement of the action or in the county in which the defendant in fact signed the contract; provided, however, that a violation of this subsection shall not occur where it is shown by the person filing such suit that the person neither knew or had reason to know that the county in which such suit was filed was neither the county in which the defendant resides at the commencement of the suit nor the county in which the defendant in fact signed the contract;

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

(25) using the term "corporation," "incorporated," or an abbreviation of either of those terms in the name of a business entity that is not incorporated under the laws of this state or another jurisdiction;

(26) selling, offering to sell, or illegally promoting an annuity contract under Chapter 22, Acts of the 57th Legislature, 3rd Called Session, 1962 (Article 6228a-5, Vernon's Texas Civil Statutes), with the intent that the annuity contract will be the subject of a salary reduction agreement, as defined by that Act, if the annuity contract is not an eligible qualified investment under that Act or is not registered with the Teacher Retirement System of Texas as required by Section 8A of that Act;

(27) taking advantage of a disaster declared by the governor under Chapter 418, Government Code, by:

(A) selling or leasing fuel, food, medicine, or another necessity at an exorbitant or excessive price; or

(B) demanding an exorbitant or excessive price in connection with the sale or lease of fuel, food, medicine, or another necessity;

<Text of (b)(28), as added by Acts 2015, 84th Leg., ch. 1023 (H.B. 1265), § 1>

(28) delivering or distributing a solicitation in connection with a good or service that:

    (A) represents that the solicitation is sent on behalf of a governmental entity when it is not; or

    (B) resembles a governmental notice or form that represents or implies that a criminal penalty may be imposed if the recipient does not remit payment for the good or service;

<center>&lt;Text of (b)(28), as added by Acts 2015, 84th Leg., ch. 1080 (H.B. 2573), § 1&gt;</center>

(28) using the translation into a foreign language of a title or other word, including "attorney," "lawyer," "licensed," "notary," and "notary public," in any written or electronic material, including an advertisement, a business card, a letterhead, stationery, a website, or an online video, in reference to a person who is not an attorney in order to imply that the person is authorized to practice law in the United States.

(29) delivering or distributing a solicitation in connection with a good or service that resembles a check or other negotiable instrument or invoice, unless the portion of the solicitation that resembles a check or other negotiable instrument or invoice includes the following notice, clearly and conspicuously printed in at least 18-point type:

"SPECIMEN-NON-NEGOTIABLE";

(30) in the production, sale, distribution, or promotion of a synthetic substance that produces and is intended to produce an effect when consumed or ingested similar to, or in excess of, the effect of a controlled substance or controlled substance analogue, as those terms are defined by Section 481.002, Health and Safety Code:

    (A) making a deceptive representation or designation about the synthetic substance; or

    (B) causing confusion or misunderstanding as to the effects the synthetic substance causes when consumed or ingested; or

(31) a licensed public insurance adjuster directly or indirectly soliciting employment, as defined by Section 38.01, Penal Code, for an attorney, or a licensed public insurance adjuster entering into a contract with an insured for the primary purpose of referring the insured to an attorney without the intent to actually perform the services customarily provided by a licensed public insurance adjuster, provided that this subdivision may not be construed to prohibit a licensed public insurance adjuster from recommending a particular attorney to an insured.

(c)(1) It is the intent of the legislature that in construing Subsection (a) of this section in suits brought under Section 17.47 of this subchapter the courts to the extent possible will be guided by Subsection (b) of this section and the interpretations given by the Federal Trade Commission and federal courts to Section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C.A. § 45(a)(1)].

    (2) In construing this subchapter the court shall not be prohibited from considering relevant and pertinent decisions of courts in other jurisdictions.

(d) For the purposes of the relief authorized in Subdivision (1) of Subsection (a) of Section 17.50 of this subchapter, the term "false, misleading, or deceptive acts or practices" is limited to the acts enumerated in specific subdivisions of Subsection (b) of this section.

**Credits**

Added by Acts 1973, 63rd Leg., p. 322, ch. 143, § 1, eff. May 21, 1973. Amended by Acts 1977, 65th Leg., p. 601, ch. 216, §§ 2, 3, eff. May 23, 1977; Acts 1977, 65th Leg., p. 892, ch. 336, § 1, eff. Aug. 29, 1977; Acts 1979, 66th Leg., p. 1327, ch. 603, § 3, eff. Aug. 27, 1979; Acts 1987, 70th Leg., ch. 280, § 1, eff. Sept. 1, 1987; Acts 1993, 73rd Leg., ch. 570, § 6, eff. Sept. 1, 1993; Acts 1995, 74th Leg., ch. 414, § 3, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 463, § 1, eff. Sept. 1, 1995; Acts 2001, 77th Leg., ch. 962, § 1, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1229, § 27, eff. June 1, 2002; Acts 2003, 78th Leg., ch. 1276, § 4.001(a), eff. Sept. 1, 2003; Acts 2005, 79th Leg., ch. 728, § 11.101, eff. Sept. 1, 2005; Acts 2007, 80th Leg., ch. 1230, § 26, eff. Sept. 1, 2007; Acts 2015, 84th Leg., ch. 1023 (H.B. 1265), § 1, eff. Sept. 1, 2015; Acts 2015, 84th Leg., ch. 1080 (H.B. 2573), § 1, eff. Sept. 1, 2015.

Notes of Decisions (1318)

V. T. C. A., Bus. & C. § 17.46, TX BUS & COM § 17.46
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB
# D

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 2. Competition and Trade Practices
      Chapter 17. Deceptive Trade Practices (Refs & Annos)
        Subchapter E. Deceptive Trade Practices and Consumer Protection (Refs & Annos)

V.T.C.A., Bus. & C. § 17.49

§ 17.49. Exemptions

Effective: May 28, 2011
Currentness

(a) Nothing in this subchapter shall apply to the owner or employees of a regularly published newspaper, magazine, or telephone directory, or broadcast station, or billboard, wherein any advertisement in violation of this subchapter is published or disseminated, unless it is established that the owner or employees of the advertising medium have knowledge of the false, deceptive, or misleading acts or practices declared to be unlawful by this subchapter, or had a direct or substantial financial interest in the sale or distribution of the unlawfully advertised good or service. Financial interest as used in this section relates to an expectation which would be the direct result of such advertisement.

(b) Nothing in this subchapter shall apply to acts or practices authorized under specific rules or regulations promulgated by the Federal Trade Commission under Section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C.A. 45(a)(1)]. The provisions of this subchapter do apply to any act or practice prohibited or not specifically authorized by a rule or regulation of the Federal Trade Commission. An act or practice is not specifically authorized if no rule or regulation has been issued on the act or practice.

(c) Nothing in this subchapter shall apply to a claim for damages based on the rendering of a professional service, the essence of which is the providing of advice, judgment, opinion, or similar professional skill. This exemption does not apply to:

(1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion;

(2) a failure to disclose information in violation of Section 17.46(b)(24);

(3) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion;

(4) breach of an express warranty that cannot be characterized as advice, judgment, or opinion; or

(5) a violation of Section 17.46(b)(26).

(d) Subsection (c) applies to a cause of action brought against the person who provided the professional service and a cause of action brought against any entity that could be found to be vicariously liable for the person's conduct.

(e) Except as specifically provided by Subsections (b) and (h), Section 17.50, nothing in this subchapter shall apply to a cause of action for bodily injury or death or for the infliction of mental anguish.

(f) Nothing in the subchapter shall apply to a claim arising out of a written contract if:

(1) the contract relates to a transaction, a project, or a set of transactions related to the same project involving total consideration by the consumer of more than $100,000;

(2) in negotiating the contract the consumer is represented by legal counsel who is not directly or indirectly identified, suggested, or selected by the defendant or an agent of the defendant; and

(3) the contract does not involve the consumer's residence.

(g) Nothing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence.

(h) A person who violates Section 17.46(b)(26) is jointly and severally liable under that subdivision for actual damages, court costs, and attorney's fees. Subject to Chapter 41, Civil Practice and Remedies Code, exemplary damages may be awarded in the event of fraud or malice.

(i) Nothing in this subchapter shall apply to a claim against a person licensed as a broker or salesperson under Chapter 1101, Occupations Code, arising from an act or omission by the person while acting as a broker or salesperson. This exemption does not apply to:

(1) an express misrepresentation of a material fact that cannot be characterized as advice, judgment, or opinion;

(2) a failure to disclose information in violation of Section 17.46(b)(24); or

(3) an unconscionable action or course of action that cannot be characterized as advice, judgment, or opinion.

**Credits**

Added by Acts 1973, 63rd Leg., p. 322, ch. 143, § 1, eff. May 21, 1973. Amended by Acts 1995, 74th Leg., ch. 414, § 4, eff. Sept. 1, 1995; Acts 2001, 77th Leg., ch. 1229, § 28, eff. June 1, 2002; Acts 2003, 78th Leg., ch. 1276, § 4.001(b), eff. Sept. 1, 2003; Acts 2011, 82nd Leg., ch. 189 (S.B. 1353), § 1, eff. May 28, 2011.

Notes of Decisions (37)

V. T. C. A., Bus. & C. § 17.49, TX BUS & COM § 17.49

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB E

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 3. Insolvency, Fraudulent Transfers, and Fraud
      Chapter 26. Statute of Frauds

V.T.C.A., Bus. & C. § 26.01

§ 26.01. Promise or Agreement Must Be in Writing

Effective: September 1, 2005
Currentness

(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

  (1) in writing; and

  (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to:

  (1) a promise by an executor or administrator to answer out of his own estate for any debt or damage due from his testator or intestate;

  (2) a promise by one person to answer for the debt, default, or miscarriage of another person;

  (3) an agreement made on consideration of marriage or on consideration of nonmarital conjugal cohabitation;

  (4) a contract for the sale of real estate;

  (5) a lease of real estate for a term longer than one year;

  (6) an agreement which is not to be performed within one year from the date of making the agreement;

  (7) a promise or agreement to pay a commission for the sale or purchase of:

    (A) an oil or gas mining lease;

    (B) an oil or gas royalty;

(C) minerals; or

(D) a mineral interest; and

(8) an agreement, promise, contract, or warranty of cure relating to medical care or results thereof made by a physician or health care provider as defined in Section 74.001, Civil Practice and Remedies Code. This section shall not apply to pharmacists.

## Credits

Acts 1967, 60th Leg., vol. 2, p. 2343, ch. 785, § 1. Amended by Acts 1977, 65th Leg., p. 2053, ch. 817, § 21.01, eff. Aug. 29, 1977; Acts 1987, 70th Leg., ch. 551, § 1, eff. Aug. 31, 1987; Acts 2005, 79th Leg., ch. 187, § 1, eff. Sept. 1, 2005.

Notes of Decisions (2145)

V. T. C. A., Bus. & C. § 26.01, TX BUS & COM § 26.01
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB
# F

**Air Jireh services SBE, MBE, HUB Certified, 8 (a)**
**The Airconditioning / Plumbing Specialist**
**5122 Leonhardt, San Antonio, TX 78233**
**Phone: (210) 590-0119 Fax: (210) 590-7789**
**MECHANICAL-PLUMBING-SITE UTILITIES**

| | | | |
|---|---|---|---|
| Name: | Weaver & Jacobs Constructors, Inc. | Date: | June 26, 2013 |
| Address: | 301 Cooperative Way | Phone: | (361) 277-9300 |
| City, State & Zip: | Cuero, TX 77954 | Fax: | (361) 277-9274 |
| E-Mail: | Brant Jacobs | | |

Job Name: TAFT ISD Front Package C

Scope of Work: *We are bidding on the HVAC as per plans*

HVAC
1. Provide and Install (3) rooftop units.
2. Provide and Install (3) exhaust fans.
3. Provide and Install (3) smoke detectors.
4. Provide and Install liner plenums.
5. Provide and Install 2" wrapped sheetmetal ductwork.
6. Provide and Install PVC condensate.
7. Provide and Install all grilles and diffusers.
8. Provide airbalance test.
9. Provide controls system.
10. Provide permit, crane, and no tax on material.

TOTAL...................................$147,732.00

### Exclusions

1  Electrical switches, disconnects, motor starters for exhaust fans or HVAC equipment, conduit pipe and interlock connections between fans is not part of this bid.

2  Roof and wall penetrations, roof curb leveling, moping, flashing and sealing is not part of this bid. To be provided by roofer or general contractor.

3  Concrete slab, or housekeeping pad for condenser, air handlers or any equipment, is not part of this bid. ( General Contractor)

4  Welded angle iron under roof curb for structural support is not par of this bid. (by GC)

5  Any platform, concrete slab, for water heaters, or any equipment is not part of this bid. (by GC)

Payment Terms:

Acceptance: **The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made as outlined above.**

| | | |
|---|---|---|
| Authorized Acceptance | | Date |
| Company Representative | Oskar Sepulveda | Date June 26, 2013 |

W&J 000006

13

# TAB
# G

**Air Jireh services SBE, MBE, HUB Certified, 8 (a)**
**The Airconditioning / Plumbing Specialist**
**5122 Leonhardt, San Antonio, TX 78233**
**Phone: (210) 590-0119  Fax: (210) 590-7789**
**MECHANICAL-PLUMBING-SITE UTILITIES**

| | | | |
|---|---|---|---|
| Name: | Weaver & Jacobs Constructors, Inc. | Date: | June 26, 2013 |
| Address: | 301 Cooperative Way | Phone: | (361) 277-9300 |
| City, State & Zip: | Cuero, TX 77954 | Fax: | (361) 277-9274 |
| E-Mail: | Brant Jacobs | | |

Job Name: TAFT ISD Front Package C

Scope of Work: We are bidding on the HVAC as per plans

**HVAC**
1. Provide and Install (3) rooftop units.
2. Provide and Install (3) exhaust fans.
3. Provide and Install (3) smoke detectors.
4. Provide and Install liner plenums.
5. Provide and Install 2" wrapped sheetmetal ductwork.
6. Provide and Install PVC condensate.
7. Provide and Install all grilles and diffusers.
8. Provide airbalance test.
9. Provide permit, crane, and no tax on material.

$132,670.00

**\*\*ALTERNATES\*\***
1. Provide and Install DDC controls for rooftop units.

ADD $15,062.00

TOTAL...................................

*Exclusions*

1  Electrical switches, disconnects, motor starters for exhaust fans or HVAC equipment , conduit pipe and interlock connections between fans is not part of this bid.

2  Roof and wall penetrations, roof curb leveling, moping, flashing and sealing is not part of this bid. To be provided by roofer or general contractor.

3  Concrete slab, or housekeeping pad for condenser, air handlers or any equipment, is not part of this bid. ( General Contractor)

4  Welded angle iron under roof curb for structural support is not par of this bid. (by GC)

5  Any platform, concrete slab,  for water heaters, or any equipment is not part of this bid. (by GC)

Payment Terms:

Acceptance:  **The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified.  Payment will be made as outlined above.**

26

Authorized Acceptance _____ Date _____

Company Representative    Oskar Sepulveda _____  Date    **June 26, 2013**

# TAB
# H

| Name: | Weaver & Jacobs Constructors, Inc. | Date: | June 26, 2013 |
|---|---|---|---|
| Address: | 301 Cooperative Way | Phone: | (361) 277-9300 |
| City, State & Zip: | Cuero, TX 77954 | Fax: | (361) 277-9274 |
| E-Mail: | Brant Jacobs | | |

Job Name: TAFT ISD Front Package C

Scope of Work: We are bidding on the HVAC as per plans

**HVAC**
1. Provide and Install (3) rooftop units.
2. Provide and Install (3) exhaust fans.
3. Provide and Install (3) smoke detectors.
4. Provide and Install liner plenums.
5. Provide and Install 2" wrapped sheetmetal ductwork.
6. Provide and Install PVC condensate.
7. Provide and Install all grilles and diffusers.
8. Provide programmable t-stats.
9. Provide airbalance test.
10. Provide permit, crane, and no tax on material.

TOTAL.................................$125,971.00

### Exclusions

1. Electrical switches, disconnects, motor starters for exhaust fans or HVAC equipment , conduit pipe and interlock connections between fans is not part of this bid.
2. Roof and wall penetrations, roof curb leveling, moping, flashing and sealing is not part of this bid. To be provided by roofer or general contractor.
3. Concrete slab, or housekeeping pad for condenser, air handlers or any equipment, is not part of this bid. ( General Contractor)
4. Welded angle iron under roof curb for structural support is not par of this bid. (by GC)
5. Any platform, concrete slab, for water heaters, or any equipment is not part of this bid. (by GC)
6. DDC Controls are not a part of this bid.

Payment Terms:

Acceptance: **The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified.  Payment will be made as outlined above.**

| Authorized Acceptance | | Date | |
|---|---|---|---|
| Company Representative | Oskar Sepulveda | Date | June 26, 2013 |

W&J 0000036

31

# TAB
# I



Weaver & Jacobs Constructors, Inc.
301 Cooperative Way
Cuero, Texas 77954
Phone: 361-277-9300
Fax: 361-277-9274

Project: 1309 - Taft High School Front Office & 2013 Improvements
400 College Street
Taft, Texas 78390

## HVAC Systems

| | | | |
|---|---|---|---|
| **DATE CREATED:** | 07/23/2013 | | |
| **CONTRACT COMPANY:** | Air Jireh Services<br>5122 Leonhardt<br>San Antonio, Texas 78233<br>Phone: (210) 590-0119<br>Fax: (210) 590-7789 | **CREATED BY:** | Chris Brzozowski (Weaver &<br>Jacobs Constructors, Inc.)<br>301 Cooperative Way<br>Cuero, Texas 77954 |
| **CONTRACT STATUS:** | Approved | **EXECUTED:** | No |
| **START DATE:** | | **ESTIMATED COMPLETION DATE:** | |
| **SIGNED CONTRACT RECEIVED DATE:** | | **ACTUAL COMPLETION DATE:** | |
| **DEFAULT RETAINAGE:** | | | |

**DESCRIPTION:**

| | |
|---|---|
| **GENERAL CONTRACT DATE:** | June 25, 2013 |
| **OWNER:** | Taft I.S.D.<br>400 College Street      Taft, TX 78390 |
| **PROJECT/JOBSITE ADDRESS:** | Taft High School Front Office and Other Improvements 2013<br>502 Rincon<br>Taft, TX 78390 |
| **ARCHITECT:** | Ferrell/Brown & Associates<br>Corpus Christi, Texas |
| **MODIFICATIONS OR ADDENDA:** | None |
| **COMMENCEMENT DATE:** | June 25, 2013 |
| **SUBSTANTIAL COMPLETION DATE:** | In accordance with Contract Documents |
| **SALES TAX:** | This project is tax exempt. Certificate is enclosed. |

**PROGRESS PAYMENTS:** SUBCONTRACTOR PROGRESS PAYMENTS WILL BE MADE NO LATER THAN 5 WORKING DAYS AFTER GENERAL CONTRACTOR RECEIVES PAYMENT. Contractor shall pay Subcontractor monthly progress payments. Subcontractor shall provide Contractor with monthly estimates by the ___25th___ of each month and ___90___ percent payment of approved estimates shall be paid. The amount of each progress payment to the Subcontractor shall be equal to the percentage of completion allowed to the contractor for the Work of this Subcontractor applied to the contract sum of this subcontract plus the amount allowed for materials and equipment suitably stored by the Subcontractor less the aggregate of previous payments to the Subcontractor less ___10___ percent retainage.

Before issuance of a progress payment, the subcontractor shall submit evidence satisfactory to the Contractor that all bills for material and equipment, and all known indebtedness connected with the Subcontractor's work have been satisfied and discharged for the previous periods for which payment has been made. A complete list of your sub-subcontractors and major material suppliers must be attached to this subcontract on the form provided.

Provided there has been no breach or default under this Master Subcontract Agreement, Contractor shall make payment on the latter of the following dates:
1. On or before the 20th day of the following month;
2. Within five days of receipt of like payment from Owner;
3. Within five days of Subcontractor curing any breach of contract, including, but not limited to, having been notified of failure to perform pursuant to Article 17, notification of intent to file liens or other claims and or the filing of such liens or other claims by sub-subcontractors and suppliers of Subcontractor, failure to provide required insurance and bonds, and failure to invoice in accordance with the terms of this Agreement. Partial Lien Waivers from each Subcontractor's subcontractors and suppliers shall constitute satisfactory evidence that all accounts have been paid in full. Notwithstanding the foregoing, Subcontractor agrees that Contractor shall never be obligated to pay Subcontractor under any circumstances, unless and until funds are received by Contractor in full, less any applicable retainage, covering the work and materials for which Subcontractor has submitted a payment request. Owner's payment to Contractor shall be a condition precedent to Contractor's obligation to pay the Subcontractor and Subcontractor's right to receive payment. This paragraph shall not be construed as a time of payment clause. Subcontractor hereby acknowledges that it is assuming the risk of non-payment by the Owner. This condition precedent also applies to Contractor's obligation to pay change orders, retainage or final payment, if any, and Contractor's exercise of a right of offset shall not be a breach of any payment provision hereof, and shall not be construed as being a violation of the Texas Trust Fund Statutes.



Contractor shall never be obligated to pay retainage to Subcontractor until Contractor has received all of Contractor's retainage in full. This paragraph supersedes all other provisions of this Agreement, and any conflicting language shall be modified or deemed to be consistent herewith.

**CERTIFIED PAYROLL:** None

**ACCEPTED ALTERNATES:** None

**UNIT PRICES:** In accordance with quote

**SUBMITTALS:** SUBMIT ALL SUBMITTALS/SHOP DRAWINGS ELECTRONICALLY; PLEASE CONTACT PROJECT MANAGER TO COORDINATE

**INSURANCE REQUIREMENTS**

A) **Commercial General Liability**

1. Commercial General Liability with limits of insurance of not less than $1,000,000 Each Occurrence, $2,000,000 Products/Completed Operations Aggregate, $1,000,000 Personal & Advertising Injury, $100,000 Fire Damage Limit (any one fire), $5,000 Medical Expense (any one person) and $2,000,000 General Annual Aggregate. If the Commercial General Liability coverage contains a General Aggregate Limit, such General Aggregate shall apply separately to each project.
2. Commercial General Liability coverage shall be written on ISO Occurrence form CG 00 01 12 07 or a substitute form providing equivalent coverage and shall cover liability arising from premises, operations, independent contractors, products-completed operations, and personal and advertising injury.
3. General Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the Commercial General Liability using ISO Additional Insured Endorsement CG 20 10 11 85 or CG 20 10 10 01 and CG 20 37 10 01 or CG 20 33 10 01 or an endorsement providing equivalent coverage to the additional insureds. This insurance for the additional insureds shall be as broad as the coverage provided for the named insured subcontractor. It shall apply as primary and non-contributory insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured.
4. Subcontractor shall maintain Commercial General Liability coverage for itself and all additional insureds for the duration of the project and maintain Completed Operations coverage for itself and each additional insured for at least three (3) years after completion of the work.

B) **Automobile Liability**

1. Business Auto Liability with limits of at least $1,000,000 for each accident.
2. Business Auto Coverage must include coverage for liability arising out of all owned, leased, hired, and non-owned automobiles.
3. General Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the auto policy.

C) **Commercial Umbrella**

1. Umbrella limits must be not less than $2,000,000 Each Occurrence and $2,000,000 General Annual Aggregate
2. Umbrella coverage must include as insureds all entities that are additional insureds on the Commercial General Liability.
3. Umbrella coverage for such additional insureds shall apply as primary and non-contributory insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured other than the Commercial General Liability, Auto Liability, and Employers Liability coverages maintained by the Subcontractor.

D) **Workers Compensation and Employers Liability**

1. Employers Liability Insurance limits of at least $1,000,000 each accident for bodily injury by accident and $1,000,000 each employee for injury by disease.
2. Where applicable, U.S. Longshore and Harborworkers Compensation Act Endorsement shall be attached to the policy.
3. Where applicable, the Maritime Coverage Endorsement shall be attached to the policy.

E) **Waiver of Subrogation**

1. Subcontractor waives all rights against Contractor, Owner, and Architect and their agents, officers, directors, and employees for recovery of damages to the extent these damages are covered by commercial general liability, commercial umbrella liability, business auto liability or workers compensation and employers liability insurance maintained per requirement stated above.

F) **Notification of Cancellation, Non-Renewal or Material Change in Coverage**

1. Subcontractors General Liability, Automobile Liability, Umbrella Liability and Workers' Compensation policies shall be endorsed to state that Contractor will be notified at least 30 days in advance in the event of cancellation, non-renewal, or material change in coverage of said policies and the subcontractor will replace "will endeavor" with "must notify" in their Certificate of Insurance.

G) **Certificates of Insurance**


1.   a.   Subcontractor shall provide Contractor with valid certificates of insurance prior to commencement of work verifying said insurance requirements have been met. Attached to each certificate of insurance shall be a copy of the Additional Insured Endorsement that is part of the Subcontractors Commercial General Liability Policy.

Insurance Certificates are required to be submitted on the Accord form. Your insurance agent should be contacted immediately and notified to forward the certificate to our office. You will not be allowed on the jobsite until a copy is on file in our Cuero office. Please note that your contract and any payments due will be held until this has been received. It is your responsibility to furnish new certificates when current coverage expires. Subcontracts could be null and void if you are unable to obtain Workers Compensation coverage, you should notify us immediately if there is a problem. Subcontractors working for you will also be required to submit certificates of insurance. No Exceptions.

**BOND REQUIREMENTS:** N/A

**CLEANUP:** Each subcontractor is responsible for cleanup and haul off of his own trash daily. The jobsite superintendent will determine the degree of cleanup required. You will get one verbal warning by our superintendent. If your work is not cleaned up, we will do it for you and back charge your subcontract accordingly.

**BACKCHARGES:** Back charges generally will not be allowed without written authorization from the Weaver & Jacobs Constructors' Project Manager. You will be back charged by Weaver & Jacobs Constructors for:

1.   Cleanup a project site if you fail to perform after a verbal warning
2.   Work that Weaver & Jacobs Constructors is forced to complete for items included under your scope of work that your firm fails to complete in a timely manner.
3.   Long Distance phone charges made by your field personnel to your office or suppliers, and all personal calls plus an administrative charge.
4.   Use of Weaver & Jacobs Constructors jobsite equipment and operator in performing any of your scope of work on this project.

Back charges between subcontractors should be submitted in a timely manner (30 days) to the Project Superintendent. These will only be allowed by written authorization between both parties and with final approval of the Project Manager.

**REQUESTS FOR EXTRAS OR CHANGE ORDERS:**
ALL CHANGE ORDERS MUST BE IN WRITING. CHANGE ORDERS MAY NOT BE DONE AT THE JOBSITE LEVEL. ALL REQUESTS FOR EXTRAS OR CHANGE ORDERS MUST COME THROUGH THE PROJECT MANAGER IN THE HOME OFFICE. THE ONLY WAY TO CHANGE YOUR CONTRACT AMOUNT IS THROUGH A WRITTEN CHANGE ORDER FROM OUR OFFICE.

**PAYMENTS TO SUBCONTRACTORS/SUPPLIERS:**
Contractor and Subcontractor agree that if Contractor at any time believes, in its sole judgment, that Subcontractor's suppliers and/or subcontractors may not be paid by Subcontractor, Contractor may elect to pay any such subcontractors or suppliers directly by joint check and shall be entitled to deduct any such sums paid from sums due to Subcontractor. Contractor's decision to pay Subcontractor's suppliers or subcontractors directly or by joint check shall not be considered a breach of this Subcontract.

**FINAL PAYMENT:** Final payment shall be due when the Work described in this subcontract is fully completed and performed in accordance with the contract documents, approved by the Architect, accepted by the Owner, and retainage for that portion of the work has been received from the owner. Before issuance of final payment, the Subcontractor shall submit evidence satisfactory to the Contractor that all payrolls, bills for material and equipment, and all known indebtedness connected with the Subcontractor's work have been satisfied and discharged.

**SUBCONTRACTOR'S**
**RESPONSIBILITIES:**

1.   The Subcontractor shall be bound to the Contractor by the terms of this agreement and of the Contract Documents between the Owner and Contractor, and shall assume toward Contractor all the obligations and responsibilities which the Contractor, by those documents, assumes toward the Owner.
2.   Subcontractor shall take all necessary precautions to protect the work of other trades from damage caused by his operations and shall be responsible, therefore, if said work is damaged as a result of Subcontractor's negligence or the negligence of his employees or persons under contract to him.
3.   The Subcontractor shall take all reasonable safety precautions with respect to his Work, shall comply with all safety measures initiated by the Contractor and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property in accordance with the requirements of the Contract Documents. The Subcontractor shall report within three days to the Contractor any injury to any of the Subcontractor's employees at the site. It is further agreed by and between the parties hereto that Subcontractor herein shall hold harmless and indemnify Contractor for any and all penalties assessed against Contractor as a result of violation of the Occupational Health and Safety Act and all requirements related thereto if such penalty or penalties are assessed or levied as a result of any violation of said Occupational Health and Safety Act by Subcontractor or any of said Subcontractor's employees, agents or independent contractors working under the direction of said Subcontractor. Failure to reimburse Contractor shall have the effect of allowing Contractor to withhold for its own benefit the amount of such penalty out of any payments due under the terms of this contract.
4.   Subcontractor shall not assign all or any part of this subcontract nor any amounts due or to become due under this subcontract without written consent of Contractor.
5.   Subcontractor warrants that all materials and equipment furnished and incorporated by him in the Project shall be new unless otherwise specified, and that all work under this Subcontract shall be good quality, free from faults and defects and in conformance with the Contract Documents.
6.   Subcontractor agrees that if he should neglect to prosecute the work diligently and properly or fail to perform any provisions of this Subcontract, the Contractor, after three working days' written notice to the Subcontractor, may, without prejudice to any other remedy he may have, make


good such deficiencies and may deduct the cost thereof from the payments then or hereafter due subcontractor. Amounts owed to subcontractor on other projects with Weaver & Jacobs Constructors, Inc. may be withheld to satisfy any indebtedness on this project.

7. Subcontractor agrees that Contractor's equipment will be available to Subcontractor only at Contractor's discretion and on mutually satisfactory terms.

8. Any change in Work from Drawings and Specifications of the Contract Documents ordered in writing by Contractor shall be adhered to by Subcontractor and shall not invalidate this subcontract and the result in additional cost or credit shall be reduced to writing and signed by Contractor and Subcontractor.

9. Subcontractor shall cooperate and coordinate with other subcontractors and Contractor where work interference might result, and shall cooperate with Contractor in scheduling and performing his work to avoid conflict or interference with the work of others.

10. The subcontractor shall promptly submit shop drawings and samples as required in order to perform his work efficiently, expeditiously and in a manner that will not cause delay in the progress of the Work of the Contractor or other Subcontractors.

11. Subcontractor shall give all notices and comply with all laws, ordinances, rules, regulations and orders of any public authority bearing on the performance of the Work under this subcontract. The Subcontractor shall secure and pay for all permits, fees and licenses necessary for the execution of the Work described in the Contract Documents as applicable to this Subcontract.

12. Subcontractor shall comply with Federal, State and local tax laws, social security acts, unemployment compensation acts and workmen's compensation acts insofar as applicable to the performance of this subcontract.

13. Subcontractor agrees that all work shall be done subject to final approval of the Architect, and the Architect's decision in matters related to artistic effect shall be final.

14. 14. INDEMNIFICATION: TO THE FULLEST EXTENT PERMITTED BY LAW, SUBCONTRACTOR AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OWNER, CONTRACTOR AND CORPORATIONS WHICH DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES CONTROL, OR ARE CONTROLLED BY, OR ARE UNDER COMMON CONTROL WITH CONTRACTOR, AND THE DIRECTORS, OFFICERS, AGENTS, AND EMPLOYEES OF OWNER, CONTRACTOR AND OF SUCH CORPORATION ALONG WITH ANY OTHER ENTITY FOR WHOM INDEMNIFICATION BY CONTRACTOR IS REQUIRED UNDER THE PRIME CONTRACT, AGAINST ALL LIABILITY AND CLAIMS FOR:

    1. 1. DEATH OF OR INJURY TO ANY AND ALL EMPLOYEES OF SUBCONTRACTOR, AND EMPLOYEES OF ANY OF SUB-CONTRACTORS' SUBCONTRACTORS AND/OR SUPPLIERS; AND

    2. 2. PROPERTY DAMAGE TO PROPERTY OF SUB- CONTRACTOR AND/OR SUBCONTRACTORS' SUB- CONTRACTORS AND/OR SUPPLIERS , INCLUDING THE LOSS OF USE OF PROPERTY.

THE INDEMNITY CONTAINED HEREIN INCLUDES INDEMNIFICATION FOR ANY AND ALL EXPENSES AND ATTORNEYS FEES RELATED TO THE CLAIMS DESCRIBED ARISING OR ALLEGED TO ARISE OUT OF OR IN ANY WAY TO SUBCONTRACTOR'S BREACH OF THIS AGREEMENT, EVEN IF SUCH CLAIM OR LIABILITY IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY INDEMNITEE, IT BEING THE EXPRESS INTENT OF THE PARTIES THAT THE SUBCONTRACTOR INDEMNIFY THE CONTRACTOR EVEN FROM THE OWNER'S AND CONTRACTOR'S OWN NEGLIGENCE. SUBCONTRACTOR ALSO AGREES TO INDEMNIFY THE OWNER AND CONTRACTOR AND HOLD IT HARMLESS FROM ALL EXPENSES, INCLUDING ATTORNEY'S FEES CAUSED BY OR RELATED TO ANY BREACH BY SUBCONTRACTOR OF THIS AGREEMENT. SUBCONTRACTOR SHALL BE RESPONSIBLE FOR DAMAGE TO OR LOSS OF THE SUBLET WORK, WHETHER COMPLETED OR UNDER CONSTRUCTION, UNTIL RESPONSIBILITY FOR THE WORK HAS BEEN ACCEPTED BY THE OWNER, AND SUBCONTRACTOR AGREES TO INDEMNIFY OWNER AND CONTRACTOR AGAINST ALL EXPENSES AND COSTS CAUSED BY ANY SUCH DAMAGE OR LOSS FROM ANY CAUSE, EVEN IF SUCH DAMAGE OR LOSS IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY INDEMNITEE. SUBCONTRACTOR WILL ALSO TAKE PRECAUTIONS TO PROTECT OTHER PORTIONS OF THE WORK. IT IS AGREED WITH RESPECT TO ANY LEGAL LIMITATIONS NOW OR HEREAFTER IN EFFECT AND AFFECTING THE VALIDITY OR ENFORCEABILITY OF THE INDEMNIFICATION OBLIGATION UNDER THE ABOVE PARAGRAPH, SUCH LEGAL LIMITATIONS ARE MADE A PART OF THE INDEMNIFICATION OBLIGATION AND SHALL OPERATE TO AMEND THE INDEMNIFICATION OBLIGATION TO THE MINIMUM EXTENT NECESSARY TO BRING THE PROVISION INTO CONFORMITY WITH THE REQUIREMENTS OF SUCH LIMITATIONS, AND AS SO MODIFIED, THE INDEMNIFICATION OBLIGATION SHALL CONTINUE IN FULL FORCE AND EFFECT.

The indemnification obligations under this Subcontract shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for the Subcontractor under worker's compensation acts, disability benefit acts or other employee benefits acts, and shall extend to include any actions brought by or in the name of any employee of the Subcontractor or of any third party to whom Subcontractor may sublet a part of the work. The obligations of the Subcontractor under this paragraph shall not extend to the liability of the Architect, the Architect's consultants, and agents and employees of any of them arising out of the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or the giving of or failure to give directions or instructions by the Architect, the Architect's consultants, and agents and employees of any of them provided such giving or failure to give is the primary cause of the injury or damage.

## CONTRACTOR'S RESPONSIBILITIES:

1. Contractor shall be bound to Subcontractor by the terms of this agreement and of the Contract Documents between the Owner and Contractor and shall assume toward Subcontractor all the obligations and responsibilities that the Owner, by those Documents, assumes toward Contractor, and shall have the benefit of all rights, remedies and redress against the Subcontractor which the Owner, by those Documents, has against Contractor, insofar as applicable to this subcontract, provided that where any provision of the Contract Documents between Owner and Contractor is inconsistent with any provision in this agreement, this agreement shall govern.

2. Contractor shall promptly notify Subcontractor of all modifications to the contract between the Owner and Contractor, which affect this subcontract and which were issued or entered into subsequent to the execution of this subcontract.

3. Contractor shall make no demand for liquidated damages for delay in any sum in excess of such amount as may be specifically named in this subcontract, and no liquidated damages shall be assessed against this Subcontractor for delays or causes attributed to other subcontractors or arising outside the scope of this subcontract.

4. Contractor shall not give instructions or orders directly to employees or workmen of subcontractor except to persons designated as authorized representatives of Subcontractor.

5. Contractor shall permit Subcontractor to be present and to submit evidence in any mediation proceeding involving his rights.

36

305

 **WEAVER & JACOBS** CONSTRUCTORS, INC.

6. Contractor shall permit the Subcontractor to exercise whatever rights Contractor may have under the Contract Documents in the choice of mediators in any dispute, if the sole cause of the dispute is the Work, materials, equipment, rights or responsibilities of the Subcontractor; or if the dispute involves the Subcontractor and any other subcontractor or subcontractors jointly, Contractor shall permit them to exercise such rights jointly.

## TERMINATION:        A.    TERMINATION FOR DEFAULT

Should Subcontractor at any time fail to supply a sufficient number of skilled workmen or a sufficient quantity of materials of proper quality, or fail in any respect to prosecute the Work covered by this Agreement with promptness and diligence, or fail to perform work of the quality required by the Prime Contract, or fail in the performance of any of the agreements herein contained, or should any workmen performing work covered by this Agreement engage in a strike or other work stoppage, or cease to work due to picketing or other such activity, Contractor may, in any of such events at its option, after seventy-two (72) hours written notice to Subcontractor, provide any such labor and materials, and deduct the cost thereof from any money then due or there after to become due Subcontractor, or, in any of such events, Contractor, may, at its option, terminate the employment of Subcontractor for the Sublet Work under this Agreement, and shall have the right to enter upon the premises and to take possession, for the purpose of completing the Sublet Work hereunder, of all the materials, tools, and equipment thereon, and to finish the Sublet Work and provide the materials, therefore, either with its own employees or other subcontractors; and in case of such discontinuance of the employment by Contractor, Subcontractor shall not be entitled to receive any further payments under this Agreement or otherwise, but shall nevertheless remain liable for any damages which Contractor incurs. If the expenses incurred by Contractor in completing the Sublet Work shall exceed the unpaid balance, Subcontractor shall pay the difference to Contractor, along with any other damages incurred by Contractor as a result of Subcontractor's default. Contractor shall have a lien upon all materials, tools and equipment taken possession of to secure the payment thereof. Subcontractor shall be liable to Contractor for all costs and damages incurred by Contractor due to the failure of performance by Subcontractor, the failure of Subcontractor to keep the progress of its work up to that of Contractor or other trades, or the failure to execute its work as directed by Contractor, Subcontractor agrees to execute any assignments necessary to make available to Contractor and the Owner the rights of subcontractor under purchase orders and subcontracts. Contractor will credit Subcontractor's account with the value of the materials and suppliers so used but there will be no credit for rent on equipment. Subcontractor will reimburse Contractor in DeWitt County, Texas, to the extent that Contractor's expense, including attorneys fees, in completing the Sublet Work and proceeding under this Article exceeds the balance which would have become due to Subcontractor under this Agreement had Subcontractor completed the Sublet Work. If Contractor's expense is less than such amount, then Subcontractor shall receive as its entire and sole compensation its actual common, necessary and reasonable costs of performing the work to the date of termination, as determined by audit of subcontractor's records, plus a reasonable markup for overhead and profit, but in no event shall such amounts due hereunder exceed the total Subcontract Amount. Subcontractor hereby waives all claims against Contractor for profits, rent on equipment or other damages related to any proceeding which Contractor institutes under this Article. The Parties agree that the terms of this article shall be binding if Contractor in good faith has determined that Subcontractor's performance is inadequate and that the Owner or Contractor or other subcontractor may be damaged, or Contractor may be unable to perform its contractual obligations, unless Contractor proceeds under this Article. The Parties agree that such determinations are difficult to make and must be made under pressing circumstances, and agree to be bound in accordance with this Article in light of the circumstances confronting Contractor at the time such decision is made. Should Contractor's decision to terminate Subcontract for default be determined by a court to be a wrongful termination, then the termination for default shall automatically be converted to a termination for convenience of the Contractor, as set out below, and Subcontractor's damages shall be determined as set out in a termination for convenience of the Contractor.

## B.    TERMINATION FOR CONVENIENCE OF CONTRACTOR OR OWNER

General Contractor may, at its option, terminate for convenience the Sublet Work in whole or, from time to time, in part, at any time by written notice to Subcontractor. Such notice shall specify the extent to which the performance of work is terminated and the effective date of such termination. Upon receipt of such notice Subcontractor shall (a) immediately discontinue the Sublet Work on the date and to the extent specified in the notice and place no further orders or sub-subcontracts for materials, service, or facilities, other than as may be required for completion of such portion of the Sublet Work that is not terminated; (b) promptly obtain cancellation upon terms satisfactory to General Contractor on all purchase orders, sub-subcontracts, rentals, or any other agreements existing for the performance of the terminated work or assign those agreements to General Contractor as directed; (c) assist General Contractor in the maintenance, protection, and disposition of work in progress, plant, tools, equipment, property, and materials acquired by Subcontractor or furnished by Subcontractor under this contract; and (d) complete performance of the Sublet Work which is not terminated. Upon any such termination, General Contractor shall have no liability for any damages, including loss of anticipated profits. As its sole right and remedy, Subcontractor shall be paid the following: (a) all amounts due and not previously paid to Subcontractor for Sublet Work completed in accordance with the Subcontract prior to such notice of termination, and for work thereafter completed as specified in such notice; (b) reasonable administrative costs of settling and paying claims arising out of the termination of Sublet Work under sub-subcontracts or purchase orders; (c) reasonable costs incurred in demobilization and the disposition of residual material, plant and equipment; and (d) a reasonable profit on items (b) and (c) of this paragraph. In the event any termination of the Subcontractor for default under the default termination article is later determined to have been improper, the termination shall automatically be deemed a termination for convenience and the Subcontractor shall be limited in its recovery strictly to the Subcontractor shall submit within 30 days after receipt of notice of termination, a proposal for an adjustment in compensation, including all incurred costs described herein. General Contractor shall review, analyze, and verify such proposal, and, if not satisfied, negotiate an equitable adjustment, and the Subcontract shall be amended in writing accordingly.

## DEFECTIVE WORK AND CLAIMS:

Payments otherwise due may be withheld by Contractor on account of defective work not remedied, claims filed, evidence indicating probability of filing of claims, failure of Subcontractor to make payments properly to its Sub--subcontractors or to make payments for material or labor, or a reasonable doubt that the Sublet Work can be completed for the balance then unpaid. If the said causes are not removed within seventy-two (72) hours after Subcontractor's receipt of written notice, Contractor may rectify the same at Subcontractor' expense. Contractor may offset against any sums due Subcontractor hereunder the amount of any liquidated or un-liquidated obligations of Subcontractor to Contractor, whether or not arising out of this Agreement. Subcontractor agrees to be bound by all the provisions of the Prime Contract, including, but not limited to, provisions relating to quantities, measurement and payment, change orders, extra work, variations in Plans and/or site conditions, time extensions and claims. Contractor agrees that it will present to Owner any reasonable claim for payment, time extension or any other reasonable item which Subcontractor, in good faith chooses to submit, provided that Subcontractor agrees to prepare all notices in a proper manner sufficiently in advance of the time for notice to permit Contractor to submit the notice, and Subcontractor agrees to prepare the documentation, comply with all other requirements of the Prime Contract, and do all things necessary to enable Contractor to present Subcontractor's claim. Contractor agrees to cooperate with Subcontractor in presenting Subcontractor's claims, and Subcontractor agrees to cooperate with Contractor and all other subcontractors of Contractor in presenting all claims, to the extent that such cooperation is reasonable. Subcontractor may not recover more from Contractor than the amount Contractor recovers from Owner in its recovery on claims, all extra work and change orders must be authorized in writing and signed by Contractor.

37

306



**MEDIATION:**

1. Prior to the filing of any lawsuit, all claims, disputes and other matters in question arising out of, or relating to, this subcontract, or the breach thereof, shall be submitted to mediation. With respect to disputes that involve Owner and Contractor, such mediation shall be in the same manner and under the same procedure as provided in the Contract Documents, except that a decision by the Architect shall not be a condition precedent to mediation.
2. This Article shall not be deemed a limitation on any rights or remedies which Subcontractor may have under any Federal or State mechanic's lien laws or under any applicable labor and material payment bonds unless such rights or remedies are expressly waived by him.

**VENUE** This agreement and all Contracts hereunder shall be governed and interpreted under the laws of the State of Texas and venue of any lawsuit shall be maintainable only in DeWitt County, Texas.

THE ABOVE SPECIFIED PROJECT IS TO BE COMPLETED IN STRICT CONFORMANCE WITH ALL SPECIFICATIONS AND CONDITIONS RELATING TO THIS AGREEMENT. IN ADDITION, THE PROJECT IS TO BE PERFORMED IN COMPLIANCE WITH OSHA REGULATIONS AND LOCAL STATE AND NATIONAL BUILDING CODES. ALTHOUGH THE GENERAL CONTRACTOR HAS CONTROL OVER THE QUALITY OF ALL WORK RELATING TO THIS PROJECT, THE SUBCONTRACTOR IS AN INDEPENDENT CONTRACTOR IN ALL RESPECTS; THE SUBCONTRACTOR IS RESPONSIBLE FOR HIS EMPLOYEES, HIS SUBCONTRACTORS, MATERIALS, EQUIPMENT, AND ALL APPLICABLE TAXES, BENEFITS AND INSURANCES. THE SUBCONTRACTOR IS RESPONSIBLE FOR COORDINATING HIS ACTIVITY WITH OTHER TRADES AND PROMPTLY CLEANING UP ANY SURPLUS OR REFUSE WHICH WAS CREATED BY THIS WORK.

**INCLUSIONS:**
**SUBCONTRACT WORK:** SUPPLY ALL MATERIAL, LABOR AND EQUIPMENT NECESSARY TO COMPLETE THE FOLLOWING SCOPE OF WORK IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS, IN CONJUCTION WITH APPROVED SUBMITTALS AND SHOP DRAWINGS, AND SHALL INCLUDE BUT NOT NECESSARILY BE LIMITED TO THE FOLLOWING:

**PER PLANS AND SPECIFICATIONS:**
**Division 15 Mechanical**

**EXCLUSIONS:**
Per quote dated 8/26/13

**ATTACHMENTS:**
Cover for Supplier Partial Waiver of Lien.docx  Sample Certificate of Insurance Remarks-Comments.pdf  Sample Certificate of Insurance.pdf  Sample Certificate of Payment.xls  Subcontractor Supplier Form.docx  Tax Exempt Certificate.PDF  Transmittal letter to subcontractors.doc  W9 Form.pdf

| # | COST CODE | DESCRIPTION | TYPE | AMOUNT |
|---|-----------|-------------|------|--------|
| 1 | | HVAC Systems | Other | $125,971.00 |
| | | | Grand Total: | $125,971.00 |

Weaver & Jacobs Constructors, Inc.
301 Cooperative Way
Cuero, Texas 77954

Air Jireh Services
5122 Leonhardt
San Antonio, Texas 78233

| SIGNATURE | DATE | SIGNATURE | DATE |
|-----------|------|-----------|------|
| | | | |

# TAB
# J



**WEAVER & JACOBS**
CONSTRUCTORS, INC.

<div style="text-align:right">

# Contract
# SC-1309-00015

</div>

Weaver & Jacobs Constructors, Inc.
301 Cooperative Way
Cuero, Texas 77954
Phone: 361-277-8300
Fax: 361-277-9274

Project: 1309 - Taft High School Front Office & 2013 Improvements
400 College Street
Taft, Texas 78390

## HVAC Systems

| | | | |
|---|---|---|---|
| **DATE CREATED:** | 07/23/2013 | | |
| **CONTRACT COMPANY:** | Crossroads Mechanical, Inc. 608 E. Crestwood Victoria, Texas 77901 Phone: (361) 578-8688 Fax: (361) 576-5423 | **CREATED BY:** | Chris Brzozowski (Weaver & Jacobs Constructors, Inc.) 301 Cooperative Way Cuero, Texas 77954 |
| **CONTRACT STATUS:** | Approved | **EXECUTED:** | No |
| **START DATE:** | | **ESTIMATED COMPLETION DATE:** | |
| **SIGNED CONTRACT RECEIVED DATE:** | | **ACTUAL COMPLETION DATE:** | |
| **DEFAULT RETAINAGE:** | | | |

**DESCRIPTION:**

**GENERAL CONTRACT DATE:**     August 20, 2013

**OWNER:**     Taft I.S.D.
400 College Street            Taft, TX 78390

**PROJECT/JOBSITE ADDRESS:**     Taft High School Front Office and Other Improvements 2013
502 Rincon
Taft, TX 78390

**ARCHITECT:**     Ferrell/Brown & Associates
Corpus Christi, Texas

**MODIFICATIONS OR ADDENDA:**     None

**COMMENCEMENT DATE:**     August 20, 2013

**SUBSTANTIAL COMPLETION DATE:**     In accordance with Contract Documents

**SALES TAX:**     This project is tax exempt. Certificate is enclosed.

**PROGRESS PAYMENTS:** SUBCONTRACTOR PROGRESS PAYMENTS WILL BE MADE NO LATER THAN 5 WORKING DAYS AFTER GENERAL CONTRACTOR RECEIVES PAYMENT.Contractor shall pay Subcontractor monthly progress payments. Subcontractor shall provide Contractor with monthly estimates by the __25th__ of each month and __90__ percent payment of approved estimates shall be paid. The amount of each progress payment to the Subcontractor shall be equal to the percentage of completion allowed to the contractor for the Work of this Subcontractor applied to the contract sum of this subcontract plus the amount allowed for materials and equipment suitably stored by the Subcontractor less the aggregate of previous payments to the Subcontractor less __10__ percent retainage.
Before issuance of a progress payment, the subcontractor shall submit evidence satisfactory to the Contractor that all bills for material and equipment, and all known indebtedness connected with the Subcontractor's work have been satisfied and discharged for the previous periods for which payment has been made. A complete list of your sub-subcontractors and major material suppliers must be attached to this subcontract on the form provided.

Provided there has been no breach or default under this Master Subcontract Agreement, Contractor shall make payment on the latter of the following dates.
1. On or before the 20th day of the following month;
2. Within five days of receipt of like payment from Owner;
3. Within five days of Subcontractor curing any breach of contract, including, but not limited to, having been notified of failure to perform pursuant to Article 17, notification of intent to file liens or other claims and or the filing of such liens or other claims by sub-subcontractors and suppliers of Subcontractor, failure to provide required insurance and bonds, and failure to invoice in accordance with the terms of this Agreement. Partial Lien Waivers from each Subcontractor's subcontractors and suppliers shall constitute satisfactory evidence that all accounts have been paid in full. Notwithstanding the foregoing, Subcontractor agrees that Contractor shall never be obligated to pay Subcontractor under any circumstances, unless and until funds are received by Contractor in full, less any applicable retainage, covering the work and materials for which Subcontractor has submitted a payment request. Owner's payment to Contractor shall be a condition precedent to Contractor's obligation to pay the Subcontractor and Subcontractor's right to receive payment. This paragraph shall not be construed as a time of payment clause. Subcontractor hereby acknowledges that it is assuming the risk of non-payment by the Owner. This condition precedent also applies to Contractor's obligation to pay change orders, retainage or final payment, if any, and Contractor's exercise of a right of offset shall not be a breach of any payment provision hereof, and shall not be construed as being a violation of the Texas Trust Fund Statutes.


Contractor shall never be obligated to pay retainage to Subcontractor until Contractor has received all of Contractor's retainage in full. This paragraph supersedes all other provisions of this Agreement, and any conflicting language shall be modified or deemed to be consistent herewith.

**CERTIFIED PAYROLL:** None

**ACCEPTED ALTERNATES:** None

**UNIT PRICES:** In accordance with quote

**SUBMITTALS:** SUBMIT ALL SUBMITTALS/SHOP DRAWINGS ELECTRONICALLY; PLEASE CONTACT PROJECT MANAGER TO COORDINATE

## INSURANCE REQUIREMENTS

**A) Commercial General Liability**

1. Commercial General Liability with limits of insurance of not less than $1,000,000 Each Occurrence, $2,000,000 Products/Completed Operations Aggregate, $1,000,000 Personal & Advertising Injury, $100,000 Fire Damage Limit (any one fire), $5,000 Medical Expense (any one person) and $2,000,000 General Annual Aggregate. If the Commercial General Liability coverage contains a General Aggregate Limit, such General Aggregate shall apply separately to each project.
2. Commercial General Liability coverage shall be written on ISO Occurrence form CG 00 01 12 07 or a substitute form providing equivalent coverage and shall cover liability arising from premises, operations, independent contractors, products-completed operations, and personal and advertising injury.
3. General Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the Commercial General Liability using ISO Additional Insured Endorsement CG 20 10 11 85 or CG 20 10 10 01 and CG 20 37 10 01 or CG 20 33 10 01 or an endorsement providing equivalent coverage to the additional insureds. This insurance for the additional insureds shall be as broad as the coverage provided for the named insured subcontractor. It shall apply as primary and non-contributory insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured.
4. Subcontractor shall maintain Commercial General Liability coverage for itself and all additional insureds for the duration of the project and maintain Completed Operations coverage for itself and each additional insured for at least three (3) years after completion of the work.

**B) Automobile Liability**

1. Business Auto Liability with limits of at least $1,000,000 for each accident.
2. Business Auto Coverage must include coverage for liability arising out of all owned, leased, hired, and non-owned automobiles.
3. General Contractor, Owner and all other parties required of the General Contractor, shall be included as insureds on the auto policy.

**C) Commercial Umbrella**

1. Umbrella limits must be not less than $2,000,000 Each Occurrence and $2,000,000 General Annual Aggregate
2. Umbrella coverage must include as insureds all entities that are additional insureds on the Commercial General Liability.
3. Umbrella coverage for such additional insureds shall apply as primary and non-contributory insurance before any other insurance or self-insurance, including any deductible, maintained by, or provided to, the additional insured other than the Commercial General Liability, Auto Liability, and Employers Liability coverages maintained by the Subcontractor.

**D) Workers Compensation and Employers Liability**

1. Employers Liability Insurance limits of at least $1,000,000 each accident for bodily injury by accident and $1,000,000 each employee for injury by disease.
2. Where applicable, U.S. Longshore and Harborworkers Compensation Act Endorsement shall be attached to the policy.
3. Where applicable, the Maritime Coverage Endorsement shall be attached to the policy.

**E) Waiver of Subrogation**

1. Subcontractor waives all rights against Contractor, Owner, and Architect and their agents, officers, directors, and employees for recovery of damages to the extent these damages are covered by commercial general liability, commercial umbrella liability, business auto liability or workers compensation and employers liability insurance maintained per requirement stated above.

**F) Notification of Cancellation, Non-Renewal or Material Change in Coverage**

1. Subcontractors General Liability, Automobile Liability, Umbrella Liability and Workers' Compensation policies shall be endorsed to state that Contractor will be notified at least 30 days in advance in the event of cancellation, non-renewal, or material change in coverage of said policies and the subcontractor will replace "will endeavor" with "must notify" in their Certificate of Insurance.

**G) Certificates of Insurance**

314


1. a. Subcontractor shall provide Contractor with valid certificates of insurance prior to commencement of work verifying said insurance requirements have been met. Attached to each certificate of insurance shall be a copy of the Additional Insured Endorsement that is part of the Subcontractors Commercial General Liability Policy.

Insurance Certificates are required to be submitted on the Accord form. Your insurance agent should be contacted immediately and notified to forward the certificate to our office. You will not be allowed on the jobsite until a copy is on file in our Cuero office. Please note that your contract and any payments due will be held until this has been received. It is your responsibility to furnish new certificates when current coverage expires. Subcontracts could be null and void if you are unable to obtain Workers Compensation coverage, you should notify us immediately if there is a problem. <u>Subcontractors working for you will also be required to submit certificates of insurance. No Exceptions.</u>

**BOND REQUIREMENTS:** N/A

**CLEANUP:** Each subcontractor is responsible for cleanup and haul off of his own trash <u>daily</u>. The jobsite superintendent will determine the degree of cleanup required. You will get one verbal warning by our superintendent. If your work is not cleaned up, we will do it for you and back charge your subcontract accordingly.

**BACKCHARGES:** Back charges generally will not be allowed without written authorization from the Weaver & Jacobs Constructors' Project Manager. You will be back charged by Weaver & Jacobs Constructors for:

1. Cleanup a project site if you fail to perform after a verbal warning
2. Work that Weaver & Jacobs Constructors is forced to complete for items included under your scope of work that your firm fails to complete in a timely manner.
3. Long Distance phone charges made by your field personnel to your office or suppliers, and all personal calls plus an administrative charge.
4. Use of Weaver & Jacobs Constructors jobsite equipment and operator in performing any of your scope of work on this project.

Back charges between subcontractors should be submitted in a timely manner (30 days) to the Project Superintendent. These will only be allowed by written authorization between both parties and with final approval of the Project Manager.

**REQUESTS FOR EXTRAS OR CHANGE ORDERS:**
ALL CHANGE ORDERS MUST BE IN WRITING. CHANGE ORDERS MAY NOT BE DONE AT THE JOBSITE LEVEL. ALL REQUESTS FOR EXTRAS OR CHANGE ORDERS MUST COME THROUGH THE PROJECT MANAGER IN THE HOME OFFICE. THE ONLY WAY TO CHANGE YOUR CONTRACT AMOUNT IS THROUGH A WRITTEN CHANGE ORDER FROM OUR OFFICE.

**PAYMENTS TO SUBCONTRACTORS/SUPPLIERS:**
Contractor and Subcontractor agree that if Contractor at any time believes, in its sole judgment, that Subcontractor's suppliers and/or subcontractors may not be paid by Subcontractor, Contractor may elect to pay any such subcontractors or suppliers directly by joint check and shall be entitled to deduct any such sums paid from sums due to Subcontractor. Contractor's decision to pay Subcontractor's suppliers or subcontractors directly or by joint check shall not be considered a breach of this Subcontract.

**FINAL PAYMENT:** Final payment shall be due when the Work described in this subcontract is fully completed and performed in accordance with the contract documents, approved by the Architect, accepted by the Owner, and retainage for that portion of the work has been received from the owner. Before issuance of final payment, the Subcontractor shall submit evidence satisfactory to the Contractor that all payrolls, bills for material and equipment, and all known indebtedness connected with the Subcontractor's work have been satisfied and discharged.

**SUBCONTRACTOR'S**
**RESPONSIBILITIES:**

1. The Subcontractor shall be bound to the Contractor by the terms of this agreement and of the Contract Documents between the Owner and Contractor, and shall assume toward Contractor all the obligations and responsibilities which the Contractor, by those documents, assumes toward the Owner.
2. Subcontractor shall take all necessary precautions to protect the work of other trades from damage caused by his operations and shall be responsible, therefore, if said work is damaged as a result of Subcontractor's negligence or the negligence of his employees or persons under contract to him.
3. The Subcontractor shall take all reasonable safety precautions with respect to his Work, shall comply with all safety measures initiated by the Contractor and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property in accordance with the requirements of the Contract Documents. The Subcontractor shall report within three days to the Contractor any injury to any of the Subcontractor's employees at the site. It is further agreed by and between the parties hereto that Subcontractor herein shall hold harmless and indemnify Contractor for any and all penalties assessed against Contractor as a result of violation of the Occupational Health and Safety Act and all requirements related thereto if such penalty or penalties are assessed or levied as a result of any violation of said Occupational Health and Safety Act by Subcontractor or any of said Subcontractor's employees, agents or independent contractors working under the direction of said Subcontractor. Failure to reimburse Contractor shall have the effect of allowing Contractor to withhold for its own benefit the amount of such penalty out of any payments due under the terms of this contract.
4. Subcontractor shall not assign all or any part of this subcontract nor any amounts due or to become due under this subcontract without written consent of Contractor.
5. Subcontractor warrants that all materials and equipment furnished and incorporated by him in the Project shall be new unless otherwise specified, and that all work under this Subcontract shall be good quality, free from faults and defects and in conformance with the Contract Documents.
6. Subcontractor agrees that if he should neglect to prosecute the work diligently and properly or fail to perform any provisions of this Subcontract, the Contractor, after three working days' written notice to the Subcontractor, may, without prejudice to any other remedy he may have, make

46

315



good such deficiencies and may deduct the cost thereof from the payments then or hereafter due subcontractor. Amounts owed to subcontractor on other projects with Weaver & Jacobs Constructors, Inc. may be withheld to satisfy any indebtedness on this project.

7. Subcontractor agrees that Contractor's equipment will be available to Subcontractor only at Contractor's discretion and on mutually satisfactory terms.
8. Any change in Work from Drawings and Specifications of the Contract Documents ordered in writing by Contractor shall be adhered to by Subcontractor and shall not invalidate this subcontract and the result in additional cost or credit shall be reduced to writing and signed by Contractor and Subcontractor.
9. Subcontractor shall cooperate and coordinate with other subcontractors and Contractor where work interference might result, and shall cooperate with Contractor in scheduling and performing his work to avoid conflict or interference with the work of others.
10. The subcontractor shall promptly submit shop drawings and samples as required in order to perform his work efficiently, expeditiously and in a manner that will not cause delay in the progress of the Work of the Contractor or other Subcontractors.
11. Subcontractor shall give all notices and comply with all laws, ordinances, rules, regulations and orders of any public authority bearing on the performance of the Work under this subcontract. The Subcontractor shall secure and pay for all permits, fees and licenses necessary for the execution of the Work described in the Contract Documents as applicable to this Subcontract.
12. Subcontractor shall comply with Federal, State and local tax laws, social security acts, unemployment compensation acts and workmen's compensation acts insofar as applicable to the performance of this subcontract.
13. Subcontractor agrees that all work shall be done subject to final approval of the Architect, and the Architect's decision in matters related to artistic effect shall be final.
14. 14. INDEMNIFICATION: TO THE FULLEST EXTENT PERMITTED BY LAW, SUBCONTRACTOR AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE OWNER, CONTRACTOR AND CORPORATIONS WHICH DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES CONTROL, OR ARE CONTROLLED BY, OR ARE UNDER COMMON CONTROL WITH CONTRACTOR, AND THE DIRECTORS, OFFICERS, AGENTS, AND EMPLOYEES OF OWNER, CONTRACTOR AND OF SUCH CORPORATION ALONG WITH ANY OTHER ENTITY FOR WHOM INDEMNIFICATION BY CONTRACTOR IS REQUIRED UNDER THE PRIME CONTRACT, AGAINST ALL LIABILITY AND CLAIMS FOR:

    1. 1. DEATH OF OR INJURY TO ANY AND ALL EMPLOYEES OF SUBCONTRACTOR, AND EMPLOYEES OF ANY OF SUB-CONTRACTORS' SUBCONTRACTORS AND/OR SUPPLIERS; AND
    2. 2. PROPERTY DAMAGE TO PROPERTY OF SUB- CONTRACTOR AND/OR SUBCONTRACTORS' SUB- CONTRACTORS AND/OR SUPPLIERS , INCLUDING THE LOSS OF USE OF PROPERTY.

THE INDEMNITY CONTAINED HEREIN INCLUDES INDEMNIFICATION FOR ANY AND ALL EXPENSES AND ATTORNEYS FEES RELATED TO THE CLAIMS DESCRIBED ARISING OR ALLEGED TO ARISE OUT OF OR IN ANY WAY TO SUBCONTRACTOR'S BREACH OF THIS AGREEMENT, EVEN IF SUCH CLAIM OR LIABILITY IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY INDEMNITEE, IT BEING THE EXPRESS INTENT OF THE PARTIES THAT THE SUBCONTRACTOR INDEMNIFY THE CONTRACTOR EVEN FROM THE OWNER'S AND CONTRACTOR'S OWN NEGLIGENCE. SUBCONTRACTOR ALSO AGREES TO INDEMNIFY THE OWNER AND CONTRACTOR AND HOLD IT HARMLESS FROM ALL EXPENSES, INCLUDING ATTORNEY'S FEES CAUSED BY OR RELATED TO ANY BREACH BY SUBCONTRACTOR OF THIS AGREEMENT. SUBCONTRACTOR SHALL BE RESPONSIBLE FOR DAMAGE TO OR LOSS OF THE SUBLET WORK, WHETHER COMPLETED OR UNDER CONSTRUCTION, UNTIL RESPONSIBILITY FOR THE WORK HAS BEEN ACCEPTED BY THE OWNER, AND SUBCONTRACTOR AGREES TO INDEMNIFY OWNER AND CONTRACTOR AGAINST ALL EXPENSES AND COSTS CAUSED BY ANY SUCH DAMAGE OR LOSS FROM ANY CAUSE, EVEN IF SUCH DAMAGE OR LOSS IS CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY INDEMNITEE. SUBCONTRACTOR WILL ALSO TAKE PRECAUTIONS TO PROTECT OTHER PORTIONS OF THE WORK. IT IS AGREED WITH RESPECT TO ANY LEGAL LIMITATIONS NOW OR HEREAFTER IN EFFECT AND AFFECTING THE VALIDITY OR ENFORCEABILITY OF THE INDEMNIFICATION OBLIGATION UNDER THE ABOVE PARAGRAPH, SUCH LEGAL LIMITATIONS ARE MADE A PART OF THE INDEMNIFICATION OBLIGATION AND SHALL OPERATE TO AMEND THE INDEMNIFICATION OBLIGATION TO THE MINIMUM EXTENT NECESSARY TO BRING THE PROVISION INTO CONFORMITY WITH THE REQUIREMENTS OF SUCH LIMITATIONS, AND AS SO MODIFIED, THE INDEMNIFICATION OBLIGATION SHALL CONTINUE IN FULL FORCE AND EFFECT.

The indemnification obligations under this Subcontract shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for the Subcontractor under worker's compensation acts, disability benefit acts or other employee benefits acts, and shall extend to include any actions brought by or in the name of any employee of the Subcontractor or of any third party to whom Subcontractor may sublet a part of the work. The obligations of the Subcontractor under this paragraph shall not extend to the liability of the Architect, the Architect's consultants, and agents and employees of any of them arising out of the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or the giving of or failure to give directions or instructions by the Architect, the Architect's consultants, and agents and employees of any of them provided such giving or failure to give is the primary cause of the injury or damage.

## CONTRACTOR'S RESPONSIBILITIES:

1. Contractor shall be bound to Subcontractor by the terms of this agreement and of the Contract Documents between the Owner and Contractor and shall assume toward Subcontractor all the obligations and responsibilities that the Owner, by those Documents, assumes toward Contractor, and shall have the benefit of all rights, remedies and redress against the Subcontractor which the Owner, by those Documents, has against Contractor, insofar as applicable to this subcontract, provided that where any provision of the Contract Documents between Owner and Contractor is inconsistent with any provision in this agreement, this agreement shall govern.
2. Contractor shall promptly notify Subcontractor of all modifications to the contract between the Owner and Contractor, which affect this subcontract and which were issued or entered into subsequent to the execution of this subcontract.
3. Contractor shall make no demand for liquidated damages for delay in any sum in excess of such amount as may be specifically named in this subcontract, and no liquidated damages shall be assessed against this Subcontractor for delays or causes attributed to other subcontractors or arising outside the scope of this subcontract.
4. Contractor shall not give instructions or orders directly to employees or workmen of subcontractor except to persons designated as authorized representatives of Subcontractor.
5. Contractor shall permit Subcontractor to be present and to submit evidence in any mediation proceeding involving his rights.


6  Contractor shall permit the Subcontractor to exercise whatever rights Contractor may have under the Contract Documents in the choice of mediators in any dispute, if the sole cause of the dispute is the Work, materials, equipment, rights or responsibilities of the Subcontractor: or if the dispute involves the Subcontractor and any other subcontractor or subcontractors jointly, Contractor shall permit them to exercise such rights jointly.

**TERMINATION:**       **A.   TERMINATION FOR DEFAULT**

Should Subcontractor at any time fail to supply a sufficient number of skilled workmen or a sufficient quantity of materials of proper quality, or fail in any respect to prosecute the Work covered by this Agreement with promptness and diligence, or fail to perform work of the quality required by the Prime Contract, or fail in the performance of any of the agreements herein contained, or should any workmen performing work covered by this Agreement engage in a strike or other work stoppage, or cease to work due to picketing or other such activity, Contractor may, in any of such events at its option, after seventy-two (72) hours written notice to Subcontractor, provide any such labor and materials, and deduct the cost thereof from any money then due or there after to become due Subcontractor, or, in any of such events, Contractor, may, at its option, terminate the employment of Subcontractor for the Sublet Work under this Agreement, and shall have the right to enter upon the premises and to take possession, for the purpose of completing the Sublet Work hereunder, of all the materials, tools, and equipment thereon, and to finish the Sublet Work and provide the materials, therefore, either with its own employees or other subcontractors; and in case of such discontinuance of the employment by Contractor, Subcontractor shall not be entitled to receive any further payments under this Agreement or otherwise, but shall nevertheless remain liable for any damages which Contractor incurs, if the expenses incurred by Contractor in completing the Sublet Work shall exceed the unpaid balance, Subcontractor shall pay the difference to Contractor, along with any other damages incurred by Contractor as a result of Subcontractor's default. Contractor shall have a lien upon all materials, tools and equipment taken possession of to secure the payment thereof. Subcontractor shall be liable to Contractor for all costs and damages incurred by Contractor due to the failure of performance by Subcontractor, the failure of Subcontractor to keep the progress of its work up to that of Contractor or other trades, or the failure to execute its work as directed by Contractor, Subcontractor agrees to execute any assignments necessary to make available to Contractor and the Owner the rights of subcontractor under purchase orders and subcontracts. Contractor will credit Subcontractor's account with the value of the materials and supplies so used but there will be no credit for rent on equipment. Subcontractor will reimburse Contractor in DeWitt County, Texas, to the extent that Contractor's expense, including attorneys fees, in completing the Sublet Work and proceeding under this Article exceeds the balance which would have become due to Subcontractor under this Agreement had Subcontractor completed the Sublet Work. If Contractor's expense is less than such amount, then Subcontractor shall receive as its entire and sole compensation its actual common, necessary and reasonable costs of performing the work to the date of termination, as determined by audit of subcontractor's records, plus a reasonable markup for overhead and profit, but in no event shall such amounts due hereunder exceed the total Subcontract Amount. Subcontractor hereby waives all claims against Contractor for profits, rent on equipment or other damages related to any proceeding which Contractor institutes under this Article. The Parties agree that the terms of this article shall be binding if Contractor in good faith has determined that Subcontractor's performance is inadequate and that the Owner or Contractor or other subcontractor may be damaged, or Contractor may be unable to perform its contractual obligations, unless Contractor proceeds under this Article. The Parties agree that such determinations are difficult to make and must be made under pressing circumstances, and agree to be bound in accordance with this Article in light of the circumstances confronting Contractor at the time such decision is made. Should Contractor's decision to terminate Subcontract for default be determined by a court to be a wrongful termination, then the termination for default shall automatically be converted to a termination for convenience of the Contractor, as set out below, and Subcontractor's damages shall be determined as set out in a termination for convenience of the Contractor.

       **B.   TERMINATION FOR CONVENIENCE OF CONTRACTOR OR OWNER**

General Contractor may, at its option, terminate the Sublet Work in whole or, from time to time, in part, at any time by written notice to Subcontractor. Such notice shall specify the extent to which the performance of work is terminated and the effective date of such termination. Upon receipt of such notice Subcontractor shall (a) immediately discontinue the Sublet Work on the date and to the extent specified in the notice and place no further orders or sub-subcontracts for materials, service, or facilities, other than as may be required for completion of such portion of the Sublet Work that is not terminated; (b) promptly obtain cancellation upon terms satisfactory to General Contractor on all purchase orders, sub-subcontracts, rentals, or any other agreements existing for the performance of the terminated work or assign those agreements to General Contractor as directed; (c) assist General Contractor in the maintenance, protection, and disposition of work in progress, plant, tools, equipment, property, and materials acquired by Subcontractor or furnished by Subcontractor under this contract; and (d) complete performance of the Sublet Work which is not terminated. Upon any such termination, General Contractor shall have no liability for any damages, including loss of anticipated profits. As its sole right and remedy, Subcontractor shall be paid the following: (a) all amounts due and not previously paid to Subcontractor for Sublet Work completed in accordance with the Subcontract prior to such notice of termination, and for work thereafter completed as specified in such notice; (b) reasonable administrative costs of settling and paying claims arising out of the termination of Sublet Work under sub-subcontracts or purchase orders; (c) reasonable costs incurred in demobilization and the disposition of residual material, plant and equipment; and (d) a reasonable profit on items (b) and (c) of this paragraph. In the event any termination of the Subcontractor for default under the default termination article is later determined to have been improper, the termination shall automatically be deemed a termination for convenience and the Subcontractor shall be limited in its recovery strictly to the Subcontractor shall submit within 30 days after receipt of notice of termination, a proposal for an adjustment in compensation, including all incurred costs described herein. General Contractor shall review, analyze, and verify such proposal, and, if not satisfied, negotiate an equitable adjustment, and the Subcontract shall be amended in writing accordingly.

**DEFECTIVE WORK AND CLAIMS:**

Payments otherwise due may be withheld by Contractor on account of defective work not remedied, claims filed, evidence indicating probability of filing of claims, failure of Subcontractor to make payments properly to its Sub-subcontractors or to make payments for material or labor, or a reasonable doubt that the Sublet Work can be completed for the balance then unpaid. If the said causes are not removed within seventy-two (72) hours after Subcontractor's receipt of written notice, Contractor may rectify the same at Subcontractor' expense. Contractor may offset against any sums due Subcontractor hereunder the amount of any liquidated or un-liquidated obligations of Subcontractor to Contractor, whether or not arising out of this Agreement. Subcontractor agrees to be bound by all the provisions of the Prime Contract, including, but not limited to, provisions relating to quantities, measurement and payment, change orders, extra work, variations in Plans and/or site conditions, time extensions and claims. Contractor agrees that it will present to Owner any reasonable claim for payment, time extension or any other reasonable item which Subcontractor, in good faith chooses to submit, provided that Subcontractor agrees to prepare all notices in a proper manner sufficiently in advance of the time for notice to permit Contractor to submit the notice, and Subcontractor agrees to prepare the documentation, comply with all other requirements of the Prime Contract, and do all things necessary to enable Contractor to present Subcontractor's claim. Contractor agrees to cooperate with Subcontractor in presenting Subcontractor's claims, and Subcontractor agrees to cooperate with Contractor and all other subcontractors of Contractor in presenting all claims, to the extent that such cooperation is reasonable. Subcontractor may not recover more from Contractor than the amount Contractor recovers from Owner in its recovery on claims, all extra work and change orders must be authorized in writing and signed by Contractor.

48

317



**MEDIATION:**

1. Prior to the filing of any lawsuit, all claims, disputes and other matters in question arising out of, or relating to, this subcontract, or the breach thereof, shall be submitted to mediation. With respect to disputes that involve Owner and Contractor, such mediation shall be in the same manner and under the same procedure as provided in the Contract Documents, except that a decision by the Architect shall not be a condition precedent to mediation.
2. This Article shall not be deemed a limitation on any rights or remedies which Subcontractor may have under any Federal or State mechanic's lien laws or under any applicable labor and material payment bonds unless such rights or remedies are expressly waived by him.

**VENUE** This agreement and all Contracts hereunder shall be governed and interpreted under the laws of the State of Texas and venue of any lawsuit shall be maintainable only in DeWitt County, Texas.

THE ABOVE SPECIFIED PROJECT IS TO BE COMPLETED IN STRICT CONFORMANCE WITH ALL SPECIFICATIONS AND CONDITIONS RELATING TO THIS AGREEMENT. IN ADDITION, THE PROJECT IS TO BE PERFORMED IN COMPLIANCE WITH OSHA REGULATIONS AND LOCAL STATE AND NATIONAL BUILDING CODES. ALTHOUGH THE GENERAL CONTRACTOR HAS CONTROL OVER THE QUALITY OF ALL WORK RELATING TO THIS PROJECT, THE SUBCONTRACTOR IS AN INDEPENDENT CONTRACTOR IN ALL RESPECTS; THE SUBCONTRACTOR IS RESPONSIBLE FOR HIS EMPLOYEES, HIS SUBCONTRACTORS, MATERIALS, EQUIPMENT, AND ALL APPLICABLE TAXES, BENEFITS AND INSURANCES. THE SUBCONTRACTOR IS RESPONSIBLE FOR COORDINATING HIS ACTIVITY WITH OTHER TRADES AND PROMPTLY CLEANING UP ANY SURPLUS OR REFUSE WHICH WAS CREATED BY THIS WORK.

**INCLUSIONS:**
**SUBCONTRACT WORK:** SUPPLY ALL MATERIAL, LABOR AND EQUIPMENT NECESSARY TO COMPLETE THE FOLLOWING SCOPE OF WORK IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS, IN CONJUCTION WITH APPROVED SUBMITTALS AND SHOP DRAWINGS, AND SHALL INCLUDE BUT NOT NECESSARILY BE LIMITED TO THE FOLLOWING:

**PER PLANS AND SPECIFICATIONS:**
Division 15 Mechanical

**EXCLUSIONS:**
Per quote dated 6/26/13 and email dated 8/19/13.

**ATTACHMENTS:**
Cover for Supplier Partial Waiver of Lien.docx  Sample Certificate of Insurance Remarks-Comments.pdf  Sample Certificate of Insurance.pdf  Sample Certificate of Payment.xls  Subcontractor Supplier Form.docx  Tax Exempt Certificate.PDF  Transmittal letter to subcontractors.doc  W9 Form.pdf

| # | COST CODE | DESCRIPTION | TYPE | AMOUNT |
|---|-----------|-------------|------|--------|
| 1 | | HVAC Systems without DDC Controls | Other | $136,467.00 |
| 2 | | Testing & Balancing | Other | $4,380.00 |
| 3 | | Thermostats & Wiring | Other | $1,500.00 |
| | | | **Grand Total:** | **$142,347.00** |

Weaver & Jacobs Constructors, Inc.
301 Cooperative Way
Cuero, Texas 77954

Crossroads Mechanical, Inc.
508 E. Crestwood
Victoria, Texas 77901

SIGNATURE     DATE     SIGNATURE     DATE